## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re:                                    )
                                          )   Case No. 06-13669 MER
FIRST ASSURED WARRANTY                    )
CORPORATION                               )   Chapter 11
                                          )
        Debtor.                           )

## ORDER

THIS MATTER comes before the Court on the Motion to Dismiss Chapter 11 Proceeding, the Amended Motion for Relief from Stay, the Motion to Excuse Turnover of Property by a Custodian and the Motion to Prohibit Use of Cash Collateral, each filed by J.P. Schmidt, Insurance Commissioner of the State of Hawaii and the Responses thereto by the Debtor and its shareholders.[1]  The Court has reviewed the pleadings, the testimony, the arguments of counsel, the legal authority cited by the parties and makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b)(1).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (G) and (O) as it involves matters concerning the administration of the estate, turnover of estate property, lifting the automatic stay and the adjustment of the debtor-creditor or equity security holder relationship.

## PROCEDURAL BACKGROUND

First Assured Warranty Corporation ("First Assured" or the "Debtor") filed its voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code on June 16, 2006.  On June 22, 2006, J.P. Schmidt, Insurance Commissioner of the State of Hawaii (the "Commissioner"), filed his Motion to Dismiss Chapter 11 Proceeding (the "Motion to Dismiss").  One day later, the Commissioner filed his Amended Motion for Relief From Stay (the "Stay Motion").  The Debtor filed objections to both the Motion to Dismiss and the Stay Motion.

On July 12, 2006, the Commissioner and the Debtor stipulated to combining the hearing on the Motion to Dismiss and the final hearing on the Stay Motion into one evidentiary hearing.  The parties agreed the matters could be heard outside the time deadlines provided by the Bankruptcy Code.  In addition, the parties also agreed the Court would hear oral arguments on

---

[1]  Pursuant to 11 U.S.C. § 1109(b), the shareholders of the Debtor, Nancy Perna, F. Mitchell Howell, Ronny Howell, Lisa Holden, Amy Sandifer and Josh Howell (the "Shareholders") also filed objections to the Motion to Dismiss and the Stay Motion and participated in the evidentiary hearing concerning these matters.

the Commissioner's Motion to Excuse Turnover of Property by a Custodian (the "Excuse Turnover Motion") and Motion to Prohibit Use of Cash Collateral (the "Cash Collateral Motion") and the Debtor's objections thereto at the same hearing.  On August 17, 18, 29, and 30, 2006, the Court convened a hearing on these matters, after which the parties were asked to provide the Court with written closing statements and responses.

At the conclusion of the hearing, the Court made specific findings pursuant to 11 U.S.C. § 1112(b)(3)[2] that there were compelling circumstances preventing the Court from rendering its decision on the Motion to Dismiss within fifteen days after the commencement of the hearing. Additionally, the parties consented to the Court rendering its decision on the Stay Motion at the same time as the Court rendered its decision on the Motion to Dismiss.

## FACTUAL BACKGROUND

First Assured was incorporated in Colorado in 1996 and was engaged in the business of selling extended automobile service warranties to the general public.  The extended automobile warranties, also known as Vehicle Service Contracts ("VSCs" or "Vehicle Service Contracts"), were either sold by First Assured through automobile dealers and agents or marketed via the internet through First Assured's wholly-owned subsidiary, 1SourceAutoWarranty.com, Inc. ("1Source").[3]

Some of the states in which First Assured conducted business required a vehicle service provider to provide proof of insurance or otherwise to demonstrate an ability to pay warranty claims before it could sell VSCs.  Thus, in 1998, PrimeGuard Insurance Company, Inc. ("PrimeGuard")[4] was created to provide contractual liability coverage to its members, First Assured and 1Source.  PrimeGuard is a Hawaii-domiciled, risk retention captive insurance

---

[2]  Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

[3]  First Assured is primarily owned by Nancy Perna ("Perna") who owns 45.94% of the Debtor.  Josh Howell, Lisa Holden, Amy Sandifer, F. Mitchell Howell and Randy Howell each own 10.81% of the Debtor.  Robert A. Dungan has no ownership interest in the Debtor.  *See Commissioner's Exhibit 144B.*  Ms. Perna is also the controlling shareholder of Warrantee Wise, Inc., a Colorado corporation that is the parent corporation of PrimeGuard Insurance Company, Inc.

[4]  The creation of PrimeGuard is authorized by the Liability Risk Retention Act of 1996 (the "LRRA"). 15 U.S.C. §§ 3901-3906.  In general, the LRRA allows groups of similarly-situated risk-bearers to create insurance cooperatives to share liability.  Because such groups would otherwise be illegal under some state laws, the LRRA partially preempts state regulation of insurance companies and prohibits a state from excluding operations by risk retention groups chartered under another state's law.  The intent of Congress was to decrease insurance rates and increase the availability of insurance coverage, thereby creating greater competition in the industry.  *See generally Preferred Physicians Mutual Risk Retention Group v. Pataki*, 85 F.3d 913, 914 (2nd Cir. 1996); *Insurance Company of the State of Penn. v. Corcoran*, 850 F.2d 88, 89 (2nd Cir. 1988); and *In re National Warranty Ins. Risk Retention Group,* 306 B.R. 614, 617 n.2 (B.A.P. 8th Cir. 2004).

company which is licensed and registered with the Hawaii Insurance Division and subject to the Commissioner's regulation and oversight.[5]

Initially, PrimeGuard provided "first-dollar" coverage for its members.  Under this arrangement, First Assured (or 1Source) would sell a VSC to a consumer and remit a significant portion of the monies collected to PrimeGuard.  PrimeGuard held these monies in a reserve account to pay liabilities related to any future loss liability for VSCs.  PrimeGuard was responsible for reimbursing First Assured for any claims it paid on behalf of VSC holders from the first dollar going forward.  Although First Assured was obligated to pay approved and covered claims, a policyholder could also seek payment from PrimeGuard directly if First Assured failed to pay on a claim.

For reasons not clearly explained at trial, in April of 2001 PrimeGuard and First Assured switched their insurance policy from "first-dollar" to "excess loss" coverage.  *See Commissioner's Exhibit 23*.  Under "excess loss" coverage, First Assured paid all approved and covered VSC claims without reimbursement from PrimeGuard.  First Assured kept and maintained most of the monies paid by VSC holders in its own loss reserve accounts (the "Loss Reserve") established for claim payment purposes.[6]  Under this new arrangement, PrimeGuard was only required to pay on a VSC claim to the extent the claim exceeded the First Assured Loss Reserve.  However, an individual policyholder could still seek payment from PrimeGuard under certain conditions if First Assured did not pay its claim.  For this reason PrimeGuard was still responsible for maintaining some kind of reserve of its own in order to satisfy any claims First Assured might not pay.[7]

The switch from "first-dollar" coverage to "excess loss" coverage was approved by the Commissioner and memorialized between First Assured and PrimeGuard in a Program Administrator Agreement which became effective on April 1, 2001 (the "Program Agreement").  *See Commissioner's Exhibits 28 and 32.*  In addition to the Program Agreement, on July 24, 2003, PrimeGuard and First Assured entered into a Loss Reserve Escrow Agreement (the "Escrow Agreement") apparently to clarify the parties' responsibilities with regard to the Loss Reserve account.

Pursuant to the Commissioner's oversight responsibilities with regard to PrimeGuard, First Assured agreed to submit an annual audited financial statement, as well as to allow PrimeGuard's Captive Insurance Administrator, Craig Watanabe ("Watanabe") and his staff to

---

[5]  PrimeGuard is also a licensed risk retention captive insurance company in Colorado.

[6]  Although the evidence is unclear, subsequent to the change in coverage PrimeGuard either transferred a portion or all of its loss reserve funds to First Assured, or First Assured set up its Loss Reserve to be funded by future VSC monies.

[7]  As testified to by Craig Watanabe, subsequent to the implementation of the "excess loss" coverage policy, approximately $18-$20 of the proceeds from each sold VSC was transmitted to PrimeGuard.

perform annual operational audits to determine PrimeGuard and First Assured's compliance with their Program Agreement and applicable Hawaii insurance law.  *See Commissioner's Exhibit 16.*  On September 22, 2003, the Commissioner issued a new directive (Memorandum 2003-5C) which imposed additional filing requirements for PrimeGuard, including a semiannual actuarial valuation of the First Assured Loss Reserve.  *See Commissioner's Exhibit 53.*

On May 16, 2004, William C. Koppenheffer, the Commissioner's Chief Examiner ("Koppenheffer"), prepared an examination of PrimeGuard covering January 1, 2001, through December 31, 2003 (the "Examination").[8]  *See Commissioner's Exhibit 1D.*  The purpose of the Examination was to assess the financial condition of PrimeGuard and to determine whether it was in compliance with applicable law and regulations.  *Id.*  One of the key findings of the Examination revealed PrimeGuard, through First Assured, was not holding sufficient reserve funds as required by Hawaii law.  Specifically, the Examination determined PrimeGuard needed to increase its "surplus" by at least $938,864.  *Id.* at p.14.  On June 15, 2005, Eric Miller, PrimeGuard's President, sent a letter to the Commissioner disputing the Examination and the finding that PrimeGuard's surplus needed to increase.  *Id.* p.16.  However, on June 21, 2005, the Commissioner adopted Koppenheffer's findings as set forth in the Examination.  *See Commissioner's Exhibit 1G.*

On September 1, 2005, PrimeGuard provided the Commissioner its own actuarial report for June 30, 2005.  The findings of PrimeGuard's report confirmed the Loss Reserve held by First Assured was approximately $1.0 million less than what was required.  *See Commissioner's Exhibit 105*, p.15.  The Commissioner then began a formal investigation of PrimeGuard to determine the sufficiency of the Loss Reserve.

On October 12, 2005, the Commissioner issued his Summary Order of Supervision Proceedings, in which Koppenheffer was appointed the Supervisor of PrimeGuard (the "Supervision Order").  *See Commissioner's Exhibit 1G.*  In part, the language contained in the Supervision Order placed PrimeGuard and First Assured, as well as their respective directors, officers, managers, agents, employees, etc., under the supervision of the Commissioner and specifically required PrimeGuard to establish a loss reserve "trust" account sufficient to fund all future claims.  *Id.*  PrimeGuard, through its President and Vice President, stipulated to the entry of the Supervision Order.  *See Commissioner's Exhibit 1G (Exhibit 3 attached thereto).*  Although the Commissioner asserts the terms of the Supervision Order applied to First Assured and 1Source, they were not named as "parties" to that Order.

Approximately one month later, on November 14, 2005, the Commissioner filed a petition in the Hawaii Circuit Court of the First Circuit (the "Hawaii Court"), to seize certain PrimeGuard assets.  *See Commissioner's Exhibit 2.*  The Hawaii Court issued an order granting the Commissioner's request on an *ex parte* basis that same day (the "Seizure Order").  Watanabe testified the petition for seizure was filed in part because the Commissioner was concerned the

_____

[8]  The Examination appears to have been completed by Koppenheffer on May 16, 2004.  However, Koppenheffer's cover letter to the Commissioner bears the date of May 16, 2005.

Loss Reserve was severely underfunded and believed property held by First Assured was actually property of PrimeGuard.

The Seizure Order provided in relevant part:

The Commissioner, including his authorized agents and representatives, is hereby authorized and directed to take possession and control of all of the assets, real and personal property, books, accounts, document, and other records . . . of Respondent PrimeGuard, and of the premises occupied by it or its agents and affiliates for transaction of business, including but not limited to the premises occupied by First Assured Warranty Corporation, located in Colorado, and until further order of the Court.

*Commissioner's Exhibit 2*, p.2.  The Seizure Order also applied "to any and all of Respondent PrimeGuard's Property held by First Assured Warranty Corporation, 1SourceAutoWarranty.com, Inc. and/or Warrantee Wise, Inc.," including several financial accounts.  *Id.* p.3.  None of the parties affected by the Seizure Order filed a motion to reconsider nor did they appeal any aspect of the Seizure Order.

On November 18, 2005, PrimeGuard, First Assured, 1Source and the Commissioner entered into an Agreement to Restricted Release of Certain Bank Accounts (the "Stipulation").[9] *See Commissioner's Exhibit 120*.  The Stipulation provided for a partial release of monies previously seized by the Commissioner in order to pay operational expenses of First Assured, including its employee payroll.  The terms of the Stipulation were approved by the Hawaii Court in its First Amended Seizure Order entered on November 21, 2005.  *See Commissioner's Exhibit 4*.  PrimeGuard, *et al.,* filed no pleading questioning or challenging the scope of the Amended Seizure Order.

On December 19, 2005, the Commissioner, after determining PrimeGuard was insolvent, filed a motion requesting PrimeGuard be placed into liquidation (the "Motion for Liquidation Order").  *See Commissioner's Exhibit 5*.  On the same day, PrimeGuard filed a Response to the Motion for Liquidation Order conceding it was insolvent and waiving any hearing.  *See Commissioner's Exhibit 127*.  Thereafter, also on December 19, 2005, the Hawaii Court entered its Order of Liquidation (the "Liquidation Order" or "Liquidation Proceeding").  *See Commissioner's Exhibit 6*.

The Liquidation Order appointed the Commissioner as Liquidator and provided he had all powers and authority as set forth in Hawaii's Insurers Supervision, Rehabilitation and Liquidation Act (the "ISRLA").  *See Commissioner's Exhibit 6*.  The Liquidation Order provided in relevant part:

---

[9]  The Stipulation was signed by Alan Kastrinsky acting in his capacity as the Vice President and Chief Financial Officer for PrimeGuard, First Assured and 1Source.

The Liquidator shall forthwith take possession of the assets of Respondent PrimeGuard and administer them under the general supervision of the Court. The Liquidator shall be vested by operation of law with title to all of the property, contracts, and rights of action and all of the books and records of PrimeGuard, wherever located, as of the entry of the Order of Liquidation. *The assets of Respondent PrimeGuard include, but are not limited to, those accounts identified in this Liquidation Order as well as those held by First Assured Warranty Corporation and/or 1SourceAutoWarranty.com (collectively "First Assured") as fiduciaries and in trust for Respondent Prime Guard.*[10]  To the extent the funds in those accounts have not been transferred to accounts held in the name of Respondent PrimeGuard, the Liquidator is ordered to take all steps necessary and appropriate to arrange for the transfer of such accounts. . . .(emphasis added).

*Commissioner's Exhibit 6*, p.3, ¶5.

Pursuant to Hawaii law, the Liquidation Order provided all insurance policies issued by PrimeGuard in effect at the time of the Liquidation Order would expire thirty days from the date of the Liquidation Order absent compliance with specific requirements. *See Commissioner's Exhibit 6*, p.9, ¶12.  The Liquidation Order also required any insured party, such as First Assured, to replace its existing insurance policy with a policy issued by another insurer within the thirty-day time period.  Watanabe testified he was not aware of any attempt by First Assured to obtain alternative insurance and therefore the insurance policy between PrimeGuard and First Assured was cancelled.  Additionally, pursuant to the Liquidation Order, "[a]ll warranty contracts, which [sic] Respondent PrimeGuard is identified as the named insurer, are hereby cancelled . . . " *Id.* p.10, ¶13.  This provision had the effect of cancelling all VSCs issued by First Assured, *et al.*  First Assured did not challenge or appeal the Liquidation Order.

In January 2006, the Commissioner, in his capacity as Liquidator, ceased funding the operations of First Assured and 1Source and terminated all remaining staff employed by First Assured.  On February 8, 2006, the Commissioner filed a motion in the Hawaii Court requesting a declaratory judgment that PrimeGuard, First Assured and 1Source were a single business enterprise or the alter-egos of one another.  *See Commissioner's Exhibit 7.*  A hearing on this motion was set for March 10, 2006; however, the hearing was stayed to allow the parties to seek settlement of the matter.

Settlement discussions were unsuccessful and on May 23, 2006, the Commissioner filed his Motion for Leave to Add First Assured Warranty Corporation and 1SourceAutoWarranty.com, Inc. as Respondents (the "Consolidation Motion").  *See Commissioner's Exhibit 11.*  First Assured and 1Source objected to the Consolidation Motion on

---

[10]  Significantly, the Hawaii Court never made a determination regarding what assets, if any, First Assured and 1Source held "as fiduciaries and in trust" for the benefit of PrimeGuard.  Rather, the Commissioner has made a unilateral decision that most, if not all of First Assured's assets are property in the Hawaii Court Liquidation Proceeding.

June 9, 2006. *See Commissioner's Exhibit 13*. In the interim, on June 6, 2006, the Hawaii Court entered an Order granting the Commissioner's motion for approval of a claims submittal procedure and claims response date, designating November 30, 2006, as a bar date for claims to be filed in the Liquidation Proceeding. *See Commissioner's Exhibit 9*. A hearing on the Consolidation Motion was scheduled in the Hawaii Court on June 19, 2006. The Debtor filed its bankruptcy case shortly before the hearing.

## REQUESTED RELIEF

The Commissioner's Motion to Dismiss asserts "cause" for dismissal pursuant to § 1112(b)(4), including the alleged bad faith of First Assured in filing its bankruptcy case, the lack of a reasonable likelihood of First Assured to rehabilitate or confirm a plan of reorganization, and gross mismanagement. Alternatively, the Commissioner requests the Court abstain from hearing the bankruptcy case under 28 U.S.C. § 1334(c)(1) and (c)(2).

On August 11, 2006, the Commissioner filed his Brief in Support of Motion to Dismiss and Motion for Relief from Stay (the "Commissioner's Trial Brief"). The Commissioner's Trial Brief asserts several additional grounds for dismissal or abstention, including First Assured's ineligibility to be a debtor under § 109(b), reverse preemption under the McCarran-Ferguson Act,[11] discretionary abstention as explained and applied in *Burford v. Sun Oil. Co.*, 319 U.S. 315 (1943) ("*Burford abstention*"), application of the *Rooker-Feldman* doctrine,[12] collateral estoppel, *res judicata*, and abstention from and dismissal of the Debtor's case under § 305.

The Stay Motion alternatively requests relief, "for cause," pursuant to § 362(d)(1) to allow the Consolidation Motion to be heard by the Hawaii Court. The Commissioner sets forth many of the same grounds for relief from stay as he does for dismissal, including bad faith, the McCarran-Ferguson reverse preemption doctrine, *Burford abstention,* mandatory and discretionary abstention, and an assertion the automatic stay does not apply to the Commissioner because he is enforcing his governmental and regulatory powers under § 362(b)(4).

In addition to these Motions, the Commissioner has also filed his Excuse Turnover Motion and Cash Collateral Motion. The Excuse Turnover Motion seeks an Order from this Court pursuant to § 543(d) excusing the Commissioner from turnover of property to the Debtor, including trust funds, equipment and documents that he now possesses by virtue of the Seizure Order, the Amended Seizure Order and the Liquidation Order. This request is based on the Commissioner's assertion that all property claimed by First Assured as property of the bankruptcy estate is subject to the exclusive jurisdiction of the Hawaii Court presiding over the PrimeGuard Liquidation Proceeding.

---

[11] Title 15 U.S.C. § 1012(b).

[12] *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

The Commissioner's Cash Collateral Motion similarly requests the Court enter an order determining certain checks the Commissioner turned over to the Debtor are property of the Liquidation Proceeding.  To the extent the checks have been negotiated by the Debtor, the Commissioner asserts the proceeds are cash collateral under § 363(a) of the Bankruptcy Code and does not consent to the Debtor's use of the proceeds.

## DISCUSSION

The primary goal of the Commissioner, as expressed through his pleadings and arguments in Court, is to consolidate First Assured, 1Source and PrimeGuard into one entity under the auspices of the Hawaii Court in the Liquidation Proceeding.  In furtherance of this goal, the Commissioner seeks the outright dismissal of First Assured's bankruptcy case, the Court's abstention from ruling on any aspect of this case or any of the issues he has raised in the Consolidation Motion, and/or for the Court's granting relief from the automatic stay to allow the Consolidation Motion to be heard by the Hawaii Court.

The breadth of the Commissioner's requested relief presents this Court with a classic "chicken or egg" conundrum.  Before this Court can determine whether to dismiss this case, abstain from further proceedings, or rule on the Commissioner's relief from stay request, it must first consider the evidence and law allegedly supporting those requests.  For example, the Commissioner's overarching argument maintains First Assured and 1Source are alter-egos of PrimeGuard.   In the context of this case, § 109(b) provides a debtor cannot be a "domestic insurance company" and be eligible to file for bankruptcy protection.  If the Commissioner is correct, the Debtor would likely be considered a "domestic insurance company" and thus not eligible for bankruptcy relief.  This eligibility finding would render the remaining grounds asserted for dismissal, abstention and stay relief moot and mandate dismissal of the Debtor's bankruptcy case.  However, the Commissioner argues this Court cannot or should not determine this issue. The Commissioner's arguments, if taken to their logical extreme, would paralyze this Court and prevent it from making any decisions in this case.  Therefore, the Court finds it must exercise the jurisdiction given to it by Congress, and must begin its analysis in this case with the question of eligibility.

## A.    Eligibility Under 11 U.S.C. § 109(b)

The threshold issue herein, as in any bankruptcy case, is whether the debtor is eligible for the relief it seeks.  *See In re Miracle Church of God in Christ*, 119 B.R. 308, 309 (Bankr. M.D. Fla. 1990) ("[I]t appears that the eligibility of the Debtor under Chapter 11 of the Bankruptcy Code is a threshold question."). Although § 109 is not "jurisdictional,"[13] the analysis and determination of eligibility for bankruptcy relief is the sole and exclusive responsibility of the

---

[13] *Cf. Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares*, 143 F.3d 1381, 1385 n.2 (10th Cir. 1998) *(citing Promenade Nat'l Bank v. Phillips*, 844 F.2d 230, 235-36, 236 n.2. (5th Cir. 1988) (section 109(c) uses the term eligibility rather than jurisdiction) and 2 Lawrence P. King *et al.*, *Collier on Bankruptcy* ¶ 109.01(2) (1998)).

bankruptcy court.  *Id.*; *see also In re Hedquist*, 342 B.R. 295, 298-299 (B.A.P. 8th Cir. 2006) ("the dismissal of a bankruptcy case for failing to meet the requirements for filing the petition [eligibility] is a core issue: the issue arises under Title 11; it arises in a case under Title 11; it concerns the administration of the estate; and it affects the adjustment of the debtor-creditor relationship.") (*citing* 28 U.S.C. § 157(b)(1), (b)(2)(A) and (b)(2)(O)).  *Accord In re Pier*, 310 B.R. 347, 352 (Bankr. N.D. Ohio 2004); *In re Cadiz Properties, Inc.*, 278 B.R. 744, 745 (Bankr. N.D. Tex. 2002); *In re Keiser*, 204 B.R. 697, 698 (Bankr. W.D. Tex. 1996)).  This Court cannot and will not abrogate its responsibilities in making that determination.  *See Colorado River Water Conservation Dist. v. United States (Colorado River)*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them").

## 1.     "Domestic Insurance Companies"

The Commissioner first argues the Debtor is a "domestic insurance company" based on its conduct and how it operated its business.  To support this argument, the Commissioner alleges the Debtor sold VSCs as if they were insurance policies and, at the least, VSCs are insurance "products" regulated by the Hawaii Division of Insurance.  The Debtor, however, contends it is not a "licensed domestic insurance" company under Colorado law and thus is eligible for relief.

Since 1910, federal bankruptcy laws have prevented insurance companies from being debtors under the Bankruptcy Code.  *See Family Health Servs., Inc. (Maxicare)*, 104 B.R. 279, 285 (Bankr. C.D. Cal. 1989).  Specifically, § 109(b)(2) states, "[a] person may be a debtor under chapter 7 of this title only if such person is not . . . (2) a domestic insurance company. . . ." "Only a person that may be a debtor under Chapter 7 of this title . . . may be a debtor under Chapter 11 of this title."  *Cash Currency Exchange, Inc. v. Shine (Cash Currency Exchange)*, 762 F.2d 542, 548 (7th Cir. 1985), *cert denied*, 474 U.S. 904 (1985); *see also* 11 U.S.C. § 109(d).  Under § 101(41), the term "person" includes a corporation such as First Assured.  Unfortunately, however, the Bankruptcy Code does not define the term "domestic insurance company."

Historically, three tests have developed in an effort to analyze whether a filing entity constitutes a "domestic insurance company."  *See In re Estate of Medcare, HMO (Estate of Medcare)*, 998 F.2d 436, 438-439 (7th Cir. 1993).  The first test is commonly known as the "Independent Classification" test and relies on federal law.  This test "construes § 109(b) itself, considering the text of the section, its legislative history and court interpretations, to determine whether a petitioner is an excluded entity."  *In re Slecke*, 147 B.R. 895, 899 (N.D. Ill. 1992).

Courts have also employed a second test, the "State Classification" test, sometimes in conjunction with the Independent Classification test.  *See Cash Currency Exchange*, 762 F.2d at 548.  As best stated by the Seventh Circuit Court of Appeals,

> The state classification test involves examination of the entity's status under the law of the state of incorporation.  If state law classifies the entity as one that is specifically excluded from being a debtor under section 109(b)(2), the inquiry

generally ends there.  If state law does not so classify the entity, the question then becomes whether the entity is the substantial equivalent of those in the excluded class.

*Id.*  In applying the State Classification test, a court should compare the powers conferred upon or withheld from the particular entity seeking relief with the powers conferred upon or withheld from entities excluded under § 109(b)(2).  *Id.* at 548.  Further, a court may look to relevant state statutes to determine whether the proposed debtor is heavily regulated by a state, whether the state has established procedures for rehabilitation and liquidation of such entities, or whether the entity conducts its business in a public or quasi-public manner.  *Id. (citing First Am. Bank & Trust Co. v. George*, 540 F.2d 343, 349 (8th Cir. 1976), *cert denied*, 429 U.S. 1011.

The third test is the "Alternative Relief" test.  *See In re Republic Trust & Sav. Co. (Republic Trust)*, 59 B.R. 606, 614 (Bankr. N.D. Okla. 1986).  This test "emphasizes congressional intent and factors of practicality and policy to determine whether, given a state reorganization and liquidation scheme to wind up a particular entity, federal bankruptcy relief would nonetheless be a satisfactory alternative to the state procedure." *Estate of Medcare*, 998 F.2d at 439 (internal quotations omitted).

The Tenth Circuit Court of Appeals has not specifically addressed which of the three applicable tests affords the most appropriate eligibility analysis.  It did, however, examine a situation analogous to the case at bar regarding whether a mortgage trust company was a "banking corporation," and thus ineligible for relief under the former Bankruptcy Act.  *See State of Kansas v. ex rel Boynton Hayes (Hayes)*, 62 F.2d 597 (10th Cir. 1934).  The Tenth Circuit framed its analysis in the following manner:

> The question presented on this appeal is this: What is the true construction to be placed upon the term 'banking corporation' within the intent and meaning of the lawmaking power when that term was employed in the amendment to the Bankruptcy Act of 1910, as it now stands?

*Id.* at 598.

This excerpt suggests an analysis similar to the Independent Classification test is appropriate.  However, the Court predominantly looked to Kansas state law to determine whether the trust company was doing business as a bank.  *Id*. at 598.  In doing so the Court reviewed Kansas statutes and the legislative history of Kansas banking laws and ultimately determined the trust company fell within the contemplation of the state legislature as a "bank," thereby finding it ineligible for bankruptcy relief.  *Id.* at 601.  Although the Tenth Circuit did not classify its reasoning within the rubric of a certain "test," its analysis was closely akin to both the Independent Classification and State Classification tests.

More recently, two divisions of this Court, under circumstances analogous to *Hayes,* relied upon the Alternative Relief and Independent Classification tests in addressing eligibility

under § 109(b).  Specifically, in *In re Bankwest Boulder Indus. Bank (Bankwest)*, 82 B.R. 559,
564 (Bankr. D. Colo. 1988) (Brooks, J.), the Court was faced with the question of whether the
Bankruptcy Code precluded an "industrial bank" from being a Chapter 11 debtor.  Although the
Court discussed the applicable tests to determine eligibility, in the end it found the Alternative
Relief test "the most useful test and the one on which this Court most heavily relies" in
determining the debtor was eligible for Chapter 11 relief.  *See Bankwest*, 82 B.R. at 564.

In another industrial bank case, a different division of this Court relied on the
Independent Classification test to determine the subject bank was eligible for Chapter 11 relief.
*In re Colorado Indus. Bank of Ft. Collins (Colorado Indus. Bank)*, 84 B.R. 735, 738 (Bankr. D.
Colo. 1988) (Clark, J.)  The Court specifically determined it need not go any further than the
"application of the fundamental canons of judicial statutory construction . . . to resort to the other
two tests."  *Id.* at 738 n.2.  In the case at bar, the Court does not need to make a decision on
which "test" is more appropriate since First Assured is a not a "domestic insurance company"
under any of the three, and thus is eligible for bankruptcy relief.

> ### a.    Independent Classification Test

The Independent Classification test looks to the language of § 109(b) itself to determine
whether a debtor is eligible for bankruptcy relief.  *See Cash Currency Exchange*, 762 F.2d at
551-52.  Section 109(b)(2) clearly states domestic insurance companies are ineligible for
bankruptcy relief.  The reasons for this rule are best described in *In re Equity Funding Corp. of
Am.*, 396 F.Supp. 1266, 1275 (C.D. Cal. 1975):

> In the case of insurance companies, most states have enacted regulatory schemes
> which include provisions for insolvency.  Since these schemes are designed to
> protect the interests of policy holders and to provide for the adjustment of the rights
> of creditors and policy holders in the event of insolvency, Congress in enacting
> Section 4 decided that liquidation of insurance companies should be left to the states.
> *In re Union Guarantee & Mortgage Co.*, 75 F.2d 984 (2nd Cir. 1935); *In re Supreme
> Lodge of the Masons Annuity*, 286 F. 180, 184 (N.D. Ga. 1923).   Since the
> reorganization of an insurance company or its adjudication as a bankrupt under the
> Act would preempt state liquidation proceedings for that company, Congress enacted
> Section 4 to preserve the exclusive jurisdiction of the states over the liquidation of
> insurance companies and to prevent the reorganization of insurance companies or
> their adjudication as bankrupts.

Courts addressing the term "domestic insurance company" have looked to the language
of the specific statute and determined the enumeration of the specific excluded entities indicates
the statute should apply to all cases not specifically excluded.  *See Cash Currency Exchange*,
762 F.2d at 552.  Moreover, if Congress had intended to make the list of excluded entities merely
illustrative rather than exhaustive, Congress could have used words such as "includes" or
"including, but not limited to," to demonstrate this intent.  Since it did not, the list of excluded
entities has been determined to be exhaustive.  *Id.*

In the context of this case, those entities specifically excluded under § 109(b)(2) do not include sellers of vehicle service contracts. Accordingly, based on the specific language of § 109(b)(2), the Court finds First Assured is not one of the entities Congress intended to exclude from bankruptcy relief.

Furthermore, the testimony elicited at trial indicates First Assured is not an insurance company. Mr. Watanabe, the Commissioner's own witness, testified First Assured was not an insurance company under the laws of Hawaii and did not sell insurance policies. Based upon Watanabe's testimony and the clear language of the statute, the Court finds First Assured is not an insurance company and cannot be excluded from bankruptcy relief under the Independent Classification test.

b.        *State Classification Test*

The VSC warranty coverage sold by First Assured, *et al*., applied to the repair of engines, transmissions, electrical systems, brakes, suspension, steering and the like. *See Debtor's Exhibit FF*, pp.2-3. Therefore, under the State Classification test, the Court looks to Colorado statutes to determine whether that state's laws would classify the Debtor as a "domestic insurance company." *See Cash Currency Exchange*, 762 F.2d at 548. COLO. REV. STAT. § 10-1-102 provides a starting place for this analysis.[14] Under COLO. REV. STAT. § 10-1-102(8), "Domestic" "designates those companies incorporated or formed in this state." First Assured clearly meets the definition of "domestic" under Colorado law.

The statutory definition of the words "insurance company," "insurer" and "insurance" are also helpful. These terms are defined in the following manner: "insurance company" includes "all corporations, associations, partnerships, or individuals engaged as insurers in the business of insurance. . . ." COLO. REV. STAT. § 10-1-102(6)(a). "Insurer" is defined as "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." COLO. REV. STAT. § 10-1-102(13). Finally, "insurance" is defined as "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies. . . ." COLO. REV. STAT. § 10-1-102(12). *See generally City of Arvada*, 19 P.3d at 13. Therefore, to meet the Colorado definitions, First Assured must be engaged in the business of making "contracts of insurance" while in the business of insurance.

First Assured was not licensed with the State of Colorado as an insurer, nor did it hold a certificate of authority to do business as an insurance company, both of which are required of Colorado insurance companies. *See* COLO. REV. STAT. §§ 10-2-401; 10-3-101; 10-3-105; *Cf. In*

---

[14] "When interpreting the meaning behind a statute, well-established principles of law dictate the courts must first look to the plain language of the statute to discern the intent of the General Assembly." *City of Arvada v. Colorado Intergovernmental Risk Sharing Agency (City of Arvada)*, 19 P.3d 10, 13 n.4. (Colo. 2001) (*citing Snyder Oil Co. v. Embree*, 862 P.2d 259, 262 (Colo. 1993); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo. 1991)).

*re Affiliated Food Stores, Inc.,* 134 B.R. 215, 220 (Bankr. N.D. Tex. 1991). Furthermore, Colorado statutes regarding Vehicle Service Contracts are not set forth under COLO. REV. STAT., Title 10, "Insurance." Rather, they are set forth in Title 42, "Vehicles and Traffic," which provides, in relevant part, a "[m]otor vehicle service contract provider" or "provider" "means a person who in connection with a motor vehicle service contract . . . [i]ncurs the obligations and liabilities to the service contract holder as set forth in the contract; and [i]ssues, makes, provides, sells, or offers to sell the contract." COLO. REV. STAT. § 42-11-102(4)(a)(I) and (II).[15] [16]

Finally, the enforcement of Title 42, Article 11, is delegated to the Attorney General of Colorado and district attorneys of the State, not to the Colorado Insurance Commissioner. *See* COLO. REV. STAT. § 42-11-107. Therefore, under the State Classification test, the Court finds Colorado law would not classify the Debtor as an "insurance company" or as an "insurer." Additionally, because Colorado law clearly provides for the sale of vehicle service contracts under a separate statutory section, the Court finds First Assured does not sell "insurance" as defined by Colorado statute.

However, this is not the end of the Court's inquiry under the State Classification test. The Commissioner argues even if First Assured is not an "insurance company" by definition, it nevertheless conducted its business selling VSCs as would an insurance company and thus should be considered an insurance company for eligibility purposes. Therefore, the Court must next address whether First Assured is the substantial equivalent of a domestic insurance company. *See Cash Currency Exchange*, 762 F.2d at 548.

To determine whether an entity is the substantial equivalent of an insurance company under § 109(b)(2), courts compare the powers conferred upon or withheld from the entity with those conferred or withheld from entities excluded under § 109(b)(2). *Id.* A court must also decide whether the entity, similar to those entities in the excluded class, is extensively regulated by the State, has extensive statutory procedures for liquidation and conducts business of a public or quasi-public fashion. *Id.*

Again referring to COLO. REV. STAT. § 42-10-101, *et seq.*, the Court finds Colorado's General Assembly has established that a person in the business of selling motor vehicle service contracts is not an insurer. Rather, COLO. REV. STAT. § 42-11-102 provides that a "motor vehicle service contract shall not be issued, made, provided, sold, or offered for sale in this state

---

[15] The definition section of COLO. REV. STAT. § 42-10-101, distinguishes between "Mechanical breakdown insurance" which "means an insurance policy, contract, or agreement, as defined in section 10-1-102(12)" and vehicle service contracts under COLO. REV. STAT. § 42-11-101(3), which does not include the same reference to Colorado's insurance statutes.

[16] Significantly, the contract between First Assured and a potential consumer specifically states, "You are reminded that your ESA [Extended Service Agreement] is not an insurance policy." *Debtor's Exhibit FF*, p.8. While not relevant to this specific analysis, it is interesting to note this contract, including the above language, was approved by the Commissioner as part of his oversight function of PrimeGuard.

unless the provider of the service contract [First Assured] is insured under a motor vehicle service contract reimbursement insurance policy issued by an insurer or administrator authorized to do business in this state [PrimeGuard]." Under this language, First Assured is the "insured" and PrimeGuard is the "insurer." Moreover, First Assured has different powers conferred and withheld from it when compared with an insurer such as PrimeGuard. Thus, these entities play different roles and cannot be the substantial equivalent of one another.

Further, entities selling vehicle service contracts under Colorado law are not extensively regulated as are insurance companies. *Compare* COLO. REV. STAT. §§ 10-3-101 to 10-3-1403 (regulation of insurance companies) *with* COLO. REV. STAT. §§ 42-10-101 to 42-11-108 (motor vehicle warranties and motor vehicle service contract insurance). Additionally, under Colorado law, vehicle service contract providers have no separate liquidation or rehabilitation procedures. *See* COLO. REV. STAT. § 42-11-101-108. Lastly, First Assured's business is not of a public or quasi-public nature. Rather, First Assured is a private entity incorporated under the laws of the State of Colorado and does not affect the public interest or provide vital services to the community. *See Cash Currency Exchange*, 762 F.2d at 551. These additional factors further support a finding that First Assured is not the substantial equivalent of an insurance company under the State Classification test.

        c.    *Alternative Relief Test*

The Court's conclusion would not change if the Court were to employ the Alternative Relief test. The central issue under this test is "whether a bankruptcy proceeding is a satisfactory method, compared with available State and Federal non-bankruptcy methods, of reorganizing or liquidating a would-be debtor." *Republic Trust*, 59 B.R. at 614. Because the Commissioner seeks to liquidate First Assured and 1Source as part of the PrimeGuard Liquidation Proceeding, the Court must look to Hawaii's insurance reorganization and liquidation statute.

Hawaii's legislature adopted the ISRLA in 1997. *See Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc.*, 974 P.2d 1017, 1022 (Haw. 1999); HAW. REV. STAT. § 431:15-101, *et seq.* One purpose of the ISRLA is to "facilitate the orderly and fair liquidation of an insolvent insurer for the 'protection of the interests of insureds, claimants, creditors, and the public generally.'" *Id.* at 1022; HAW. REV. STAT. 431:15-101(d).

The ISRLA generally provides the Commissioner powers similar to those authorized by the Bankruptcy Code. For example, the ISRLA appoints the Hawaii Insurance Commissioner as a liquidator to take possession of all of an insurer's assets and to administer them as would a Chapter 7 trustee. HAW. REV. STAT. § 431:15-307(a). Similarly, the ISRLA provides for an automatic stay of all proceedings against an insolvent insurance company upon the appointment of a liquidator. HAW. REV. STAT. § 431:15-313(a). A liquidator is also empowered to collect all debts and moneys due belonging to the insurer and to exercise the right of creditors in a manner resembling the strong arm provisions provided in § 544. *See* HAW. REV. STAT. § 431:15-310(6)(C) and (19). Additionally, a liquidator is authorized to avoid pre-liquidation and post-liquidation preferences and liens as well as recover fraudulent conveyances under HAW. REV.

STAT. § 431:15-315-317.  Thus, a commissioner appointed in a liquidation proceeding under Hawaii law has duties and powers similar to those of a trustee under the Bankruptcy Code.

However, one significant difference between the ISRLA and the Bankruptcy Code is their respective priorities for distribution.  Under the priority section of the ISRLA, Class 2 policyholders and third party claimants under insurance policies receive distribution before general unsecured creditors, who are relegated to Class 5.  *See* HAW. REV. STAT. § 431:15-332(2) and (5).  Under the Bankruptcy Code, such claims would be treated equally and one class of unsecured creditors could not be subordinated to another class of creditors without a judicial determination.[17]  For this reason, the Court finds the Bankruptcy Code provides a satisfactory alternative method, if not a superior method, to facilitate the orderly and fair rehabilitation or liquidation of the Debtor for the benefit of *all* creditors.  After evaluating the situation under all the potentially relevant "tests," the Court concludes First Assured is not a "domestic insurance company" under § 109(b)(2).

## 2.    Alter-Ego Analysis

The eligibility analysis cannot end there.  Throughout the pleadings, testimony and arguments made by the Commissioner in this case there is an underlying theme that the Debtor is the alter-ego of PrimeGuard.  If this argument is true, since PrimeGuard is a "domestic insurance company," First Assured would share this classification and become ineligible for bankruptcy relief.  Therefore, to complete the eligibility analysis, this Court must address the alter-ego assertion.  *See, e.g., In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 264 (Bankr. D. Colo. 1992) (the bankruptcy court determined whether the debtor could be considered the "alter-ego" of another entity for purposes of eligibility under § 109(c)); *Murphy v. McArthur*, 146 Fed. Appx. 285, 287-88 (10th Cir. 2005) (unpublished disposition) (approving a bankruptcy court's analysis of an alter-ego analysis as part of an eligibility analysis under § 109(e)).

Ordinarily, the Court must initially determine which state's laws are to be applied.  In this instance, however, the Court need not engage in this exercise, as the Commissioner fails to provide sufficient evidence to establish the elements for an alter-ego claim regardless of the applicable law.  The Court notes the Commissioner asserts the existence of substantial evidence for his alter-ego claim within his Consolidation Motion.  However, the Consolidation Motion was admitted for the sole limited purpose of establishing the pleading was filed in the Hawaii Court Liquidation Proceeding.  As a result, the claims and allegations contained within that document cannot and will not be considered by this Court in assessing the alter-ego claim, except to the extent independent evidence supporting such allegations was presented by the Commissioner in the hearing on the Motion to Dismiss.

### a.    Hawaii Alter-Ego Law

---

[17] "[T]he basic design of the Bankruptcy Act [is]...to distribute the nonexempt property of the debtor fairly and equally among his creditors. . . ." *State Finance Co. v. Morrow*, 216 F.2d 676, 679 (10th Cir. 1954).

Under Hawaii law, "a corporation will be deemed the alter-ego of another 'where recognition of the corporate fiction would bring about injustice and inequity or when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim.'" *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.(Robert's)*, 982 P.2d 853, 870-871 (Haw. 1999) (*citing Chung v. Animal Clinic, Inc. (Chung)*, 636 P.2d 721, 723 (Haw. 1981)). Hawaii courts having the occasion to apply the alter-ego doctrine do so "with great caution and reluctance." *Robert's*, 982 at 870 and n.2. In order to disregard the corporate fiction

> it must be made to appear that [1] the corporation is not only influenced and governed by that person, but that there is such a unity of interest ⋯ that the individuality, or separateness, of such person and corporation has ceased, and [2] that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

*Id.* at 871. To assist in this determination, Hawaii courts may consider several non-exhaustive factors. The factors include:

> [1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identi[ty] of ⋯ directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal

transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Id.* Courts may also consider additional factors such as: "(1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity . . . has been adopted or used to evade the provisions of a statute." *Id.* No one factor is controlling. *Id.* at 872.

Many of the factors mentioned in *Robert's* are inapplicable in this case. As to those factors that may apply, the Court makes the following observations:

- Commingling Funds and Other Assets, Failure to Segregate Funds of the Separate Entities, and the Unauthorized Diversion of Corporate Funds or Assets to other than Corporate Uses

The evidence established First Assured maintained its own bank accounts, financial records and otherwise segregated its financial operations from PrimeGuard. Indeed, the Commissioner provided the Court with independent and separate financial audits for 2001 through 2004. *See Commissioner's Exhibits 1L and 90.* Additionally, although there was testimony Ralph Holden received personal loans from First Assured, these loans were documented and agreed to by First Assured's then-President, Alan Kastrinsky, and were timely paid back with interest. *See Commissioner's Exhibits 94 and 101.* Thus, they do not appear to be unauthorized diversions of corporate assets.

- Ownership and Supervision of the Entities

PrimeGuard, First Assured and 1Source shared a common controlling shareholder in Perna, who owns the major stake in each of the entities. Additionally, the two entities were supervised, managed and controlled, for the most part, by the same officers and directors. However, "[u]nder Hawaii law, there is no specified or minimum number of stockholders that is required for valid corporate existence. The fact that a sole or principal stockholder dominates a corporation violates no statutory requirement, is not opposed to public policy, and constitutes no fraud on creditors. . . . [C]ontrol of corporations is not solely determinative on the issue of whether we should disregard the corporate entity." *Chung*, 636 P.2d at 724.

- Use of Same Office or Business Location

It is unclear whether PrimeGuard, First Assured and 1Source maintained the same office or business location. First Assured and 1Source had offices located in Colorado which PrimeGuard also may have occupied. However, Watanabe testified PrimeGuard also maintained

an office in Hawaii as required by Hawaii law.  There was no evidence presented that First Assured operated from those premises.

- Failure to Adequately Capitalize the Entities

Undercapitalization refers to "[t]he financial condition of a firm that does not have enough capital to carry on its business." *Black's Law Dictionary* (8th ed. 2004).  The testimony indicates that immediately prior to entry of the Supervision Order, the Commissioner was concerned that PrimeGuard may have been undercapitalized to carry on its insurance business based on certain actuarial reports PrimeGuard had submitted to the Commissioner.  *See Commissioner's Exhibit 1G.*  However, there is ample evidence First Assured and 1Source were adequately capitalized and were operating their businesses prior to the Seizure and Liquidation Orders.

- Disregard for Legal Formalities

Similarly, based on the evidence, the Court can find no disregard for the legal formalities of the individual entities.  In a letter dated August 22, 2003, regarding First Assured's financial statements, the Commissioner stated, "[s]ince the filing of PrimeGuard-RRG's initial captive application, we have always recognized PrimeGuard-RRG and [First Assured] as separate and distinct legal entities. . . ."  *Commissioner's Exhibit 38.*  No evidence was presented which suggested the situation had changed subsequent to August 2003.

The Court finds the additional elements of Hawaii alter-ego law have little or no applicability to this case.  For these reasons, the Court finds the Commissioner has failed to prove that First Assured is the alter-ego of PrimeGuard under Hawaii law.  Additionally, because the Commissioner has failed to prove the alter-ego relationship, the Court finds under the circumstances of this case it would not promote an injustice to recognize the separate legal existence of each corporation.

   b.   *Colorado Alter-Ego Law*

Under Colorado law, "[a]n alter-ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'"  *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (*citing Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004); *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo. 1981)).

In determining whether to disregard the corporate fiction and treat the corporation and shareholder as alter-egos, the Colorado Supreme Court has set forth several factors similar to those used by Hawaii courts,

including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*In re Phillips*, 139 P.3d at 644 (*citing Leonard v. McMorris*, 63 P.3d 323, 330; *Newport Steel Corp. v. Thompson*, 757 F.Supp. 1152, 1156 (D.Colo. 1990)).

Secondarily, a court should determine whether "justice requires recognizing the substance of the relationship between the shareholder and corporation over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim.'" *Id.* Finally, the court should determine if an equitable result will be achieved by disregarding the corporate veil. *Id.*

With regard to the first and second factors, as indicated previously, First Assured and PrimeGuard were operated as distinct business entities and maintained separate bank accounts and financial statements. Regarding the third factor, the Court has no evidence before it that First Assured did not maintain and keep adequate business records.

The fourth factor under Colorado law is similar to the ownership and supervision element under Hawaii law. As the Court indicated, although the three entities shared a common controlling shareholder and the entities were supervised, managed and controlled by the same officers and directors, this is but one factor of the analysis and is not conclusive. *See, e.g., Newport Steele Corp. v. Thompson*, 757 F.Supp 1152, 1156-1157 (D.Colo. 1990) (no one factor controls the analysis in determining whether the corporate form should be disregarded).

The fifth factor asks whether the entities were thinly capitalized. Similar to its analysis above, the Court finds that although PrimeGuard may not have had sufficient assets to carry on its business, no evidence was presented suggesting First Assured and 1Source were undercapitalized. In fact, the evidence presented thus far suggests the Commissioner has sought to consolidate PrimeGuard with First Assured and 1Source because of significant assets held by First Assured.

Under the sixth factor, the Court finds First Assured and 1Source were not the "mere shells" of PrimeGuard and vice versa. Rather, the entities shared an insurer-insured relationship that was necessary to allow First Assured and 1Source to sell and issue VSCs.

The seventh factor addresses whether the entities disregarded legal formalities. Based on the evidence provided, the Court finds the entities, although closely related, did not disregard common legal formalities. The Commissioner admitted in August 2003 that since PrimeGuard's inception he had always considered PrimeGuard and First Assured as separate and distinct legal

Page 19 of  41

entities.  *See Commissioner's Exhibit 38.*  As noted above, no evidence was presented suggesting this had changed after August 2003.

The eighth and final factor relates to whether there was a diversion of corporate assets for noncorporate use.  As discussed above, although Ralph Holden received personal loans from First Assured, the loans were documented and timely paid back with interest.  Thus, as under Hawaii law, the Court finds the entities' corporate form has not been abused under Colorado law. The Court finds justice does not require it to disregard the corporate form, because there has been no assertion First Assured used its corporate fiction to perpetrate a fraud against PrimeGuard or otherwise defeat a rightful claim.  *In re Phillips*, 139 P.3d at 644.  Similarly, no equitable result would be achieved by consolidating First Assured and PrimeGuard into one entity because the entities have maintained their separate corporate forms and no purpose would be served by piercing the corporate veil.  *Id.*

 In summary, based on the testimony elicited at trial, the admitted exhibits and the applicable legal authority, the Court finds the Commissioner has failed to prove First Assured is the alter-ego of PrimeGuard.  Therefore, First Assured is eligible for protection under the Bankruptcy Code.

**B.      Abstention Under 28 U.S.C. § 1334**

As an alternative argument, the Commissioner asserts this Court must abstain from exercising jurisdiction in this case because of the presumed overlap between this case and the Hawaii liquidation of PrimeGuard.  This case presents a different situation from typical mandatory or discretionary abstention scenarios.[18]  Ordinarily, the abstention doctrine is applied when a state court case is removed to a federal court, or a new action is filed in the federal court alleging the same or similar claims or allegations to those in a existing state court case.  Herein, the Commissioner apparently seeks to force the Court's abstention from any further proceedings in this bankruptcy case pending a determination by the Hawaii Court as to whether to expand the scope of a the Liquidation Proceeding to include First Assured and 1Source.

28 U.S.C. § 1334(a) states, "[e]xcept as provided in subsection (b) of this section, the district courts[19] shall have original and *exclusive* jurisdiction of all cases under title 11." (emphasis added).  Because this Court maintains exclusive jurisdiction to decide matters under Title 11, abstention from the Debtor's entire case is simply not an option.

------

[18]   The Court has conducted a review of case law and could find no instance in which mandatory or discretionary abstention under 28 U.S.C. § 1334(c) have been used dismiss or "freeze" an entire bankruptcy case.

[19]   Pursuant to 28 U.S.C. § 157(a) "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in a case under title 11 shall be referred to the bankruptcy judges for the district."  The district court in this jurisdiction has made this referral.  *See United States District Court for the District of Colorado General Procedure Order No.1984-3* and D.C.Colo.L.Civ.R. 84.1(A).

Additionally, under 28 U.S.C. § 1334(c)(1) and (c)(2) abstention must be based on a particular "proceeding" arising "under," "in" or "related" to a case under Title 11. The Commissioner's Motion to Dismiss, Stay Motion, Excuse Turnover Motion and Cash Collateral Motion each request specific relief from this Court. Therefore, the Commissioner surely is not requesting this Court abstain from determining those motions. Otherwise, there is no pending "proceeding" before this Court from which this Court could abstain. In making this finding, the Court is not ruling on the merits of the Commissioner's abstention request. Instead, the Court finds the Commissioner's request for abstention under 28 U.S.C. § 1334(c)(1) and (c)(2) is premature. The Court cannot rule on such matters until there is a contested matter or adversary proceeding filed from which this Court could possibly abstain.[20] Because there is no "proceeding" from which to abstain, the Commissioner's abstention argument is better addressed under the context of § 305.

## C.    <u>Abstention Under 11 U.S.C. § 305</u>

The Commissioner also argues the Court should abstain from hearing this case pursuant to § 305. However, he provides little support for his argument. Section 305(a)(1) states, "the court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title at any time if–(1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ." "The focus on the individual facts of each case recognizes that the interests of the debtor and the creditors, which must be weighed under § 305, are unique to each individual case." *In re Iowa Trust*, 135 B.R. 615, 621 (Bankr. N.D. Iowa 1992). Accordingly, a bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit to seek dismissal. Reasoned judgment based on articulated facts is the only test which the statute itself requires. *In re Spade*, 269 B.R. 225, 228 (D.Colo. 2001). After reviewing the findings by the above courts in their evaluation of § 305, this Court believes the factors most pertinent to this case are: (1) the motivation of the parties seeking bankruptcy jurisdiction; (2) the availability of another forum to provide the identical or substantially similar relief; (3) the economy and efficiency of administering the case in bankruptcy court; and (4) the prejudice to the parties caused by keeping the case in the bankruptcy court. *Id.* at 228-229.

First Assured is a Colorado corporation with its own assets and creditors. While there may be an overlap in the creditors of First Assured and PrimeGuard, the decision by First Assured to liquidate its operations through its own bankruptcy case, rather than to be consolidated and liquidated with a related entity, appears to be a legitimate business decision

---

[20] Arguably, the Commissioner's Excuse Turnover Motion may raise issues in which abstention under 28 U.S.C. § 1334(c) could be raised, however, the Commissioner does not request abstention in that motion. Additionally, the grounds asserted in the Excuse Turnover Motion are based solely on the Commissioner's alter-ego assertions from which this Court has determined it cannot abstain and on his request for relief from stay to allow the Hawaii Court to determine his Consolidation Motion. Thus, abstention under 28 U.S.C. § 1334(c) is not appropriate at this time.

because First Assured has presented evidence that its assets, claims and interests differ from those of PrimeGuard.[21]

Because First Assured is not an insurance company, it cannot be liquidated under the ISRLA.[22] If First Assured cannot be liquidated in a state insolvency court, its only other option is the bankruptcy court. While liquidation is a substantially similar process in both the Hawaii Court and the bankruptcy court, there are some significant differences, as noted above, particularly concerning how creditors' claims are classified and treated.

The third factor requires this Court to balance the economy and efficiencies of administering the case in the bankruptcy court. This case admittedly has been and will be a challenging case for the parties and the Court to administer. However, this challenge would be visited on any other court, state or federal, having the same responsibility. Thus, the economy and efficiency of administering the case in the bankruptcy court appears to be a neutral factor.

The fourth and possibly most important factor is the prejudice visited on the parties by keeping the Debtor's case in this Court. The liquidation of First Assured will not prejudice most parties. To the contrary, unsecured creditors and policyholders will be treated equally, whereas under the Hawaii distribution scheme, unsecured creditors' claims would be subordinated to policyholder claims. Further, First Assured will not be prejudiced because the bankruptcy court is its forum of choice. Although, the Commissioner may incur expenses in both the PrimeGuard Liquidation Proceeding and in this case, the actions giving rise to such expenses constitute a business decision made by the Commissioner. Therefore, the Court finds abstention from and dismissal of the Debtor's bankruptcy case are not appropriate under § 305.

**D.    McCarran-Ferguson Act**

The Commissioner argues if First Assured is eligible for bankruptcy relief, and if abstention under 28 U.S.C. § 1334(c) and § 305 are not appropriate, the Court should nevertheless dismiss or abstain from this bankruptcy case under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (the "McCarran-Ferguson Act"). The McCarran-Ferguson Act states in relevant part,

> (a) State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

---

[21]   The evidence before the Court indicates the approximate 60,000 customers holding VSCs are creditors of First Assured, having entered into a contract with that entity (excluding those individuals executing a contract with 1Source). After PrimeGuard and First Assured switched from the "first-dollar" policy to the "excess loss" policy, liability to PrimeGuard was for claims not paid or rejected by First Assured. As a result, there is an issue as to the identity or potential "overlap" of creditors.

[22]   Pursuant to HAW. REV. STAT. § 431:15-102, the Commissioner may only liquidate insurers, persons in the process of organizing with the intent to do an insurance business, benefit societies and all title companies.

(b) Federal regulation.  No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012.  The McCarran-Ferguson Act has been interpreted as overturning traditional federal rules of preemption and allowing state insurance statutes to "reverse preempt" federal statutes that affect state regulation of the insurance industry.[23]  *See Genord v. Blue Cross & Blue Shield of Michigan (Genord)*, 440 F.3d 802, 805 (6th Cir. 2006), *cert denied*, 2006 WL 2592732 (U.S. Nov. 13, 2006) (discussing McCarran-Ferguson Act and "reverse preemption"); *Ruthardt v. U.S.*, 303 F.3d 375, 380 (1st Cir. 2002) (describing application of the McCarran-Ferguson Act as "'reverse preemption' – of federal law by state law – by Congress' consent").

The McCarran-Ferguson Act has its origins in the Commerce Clause disputes of the 1940s.  Historically, it had been assumed that "[i]ssuing a policy of insurance is not a transaction of commerce. . . ."  *Paul v. Virginia*, 75 U.S. 168, 183 (1869).  Thus, insurance was viewed as a state matter beyond Congress' power to regulate as interstate commerce.  However, in 1944, the Supreme Court held an insurance company conducting a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to federal antitrust laws.  *South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944).  This result was widely perceived as a threat to state power over the insurance industry.  *See United States Dept. of Treasury v. Fabe (Fabe)*, 508 U.S. 491, 499-500 (1993).  To allay these fears, Congress quickly passed the McCarran-Ferguson Act to reaffirm state supremacy in the realm of insurance regulation.  *Id.* at 500; *see also Barton Bank of Marion County, N.A.*, 517 U.S. 25, 40 (1996).

Since the McCarran-Ferguson Act's inception, there has been relatively little guidance from the federal courts concerning the scope and breadth of the McCarran-Ferguson Act as it relates to the intersection of state insurance insolvency proceedings and the Bankruptcy Code.  *See generally* Goddard, *In Between the Trenches: The Jurisdictional Conflict Between a Bankruptcy Court and a State Insurance Receivership Court*, 9 Conn. Ins. L.J. 567, 573-74 (2003).  The Supreme Court provided some guidance, at least with respect to the state insurance insolvency side of the equation, with its opinion in *Fabe*.  In *Fabe*, the Supreme Court considered whether a priority scheme set forth in an Ohio insurance insolvency statute "reverse preempted" the priorities established under the Federal Priority Act.[24]  *See Fabe*, 508 U.S. at 499.  The Court ultimately held the Ohio priority scheme "regulated the business of insurance" and therefore reverse preempted the Federal Priority Act, but only to the extent the Ohio priority scheme protected the interests of insurance policyholders.  *Id.* at 506, 508.

---

[23]  The McCarran-Ferguson Act is a reverse preemption statute and is not a jurisdictional divestment act. *See, e.g., Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 702 (10th Cir. 1988).

[24]  *See* 31 U.S.C. § 3713

Five years later in *Davister Corp. v. United Republic Life Ins. Co. (Davister)*, 152 F.3d 1277, 1279 n.1 (10th Cir. 1998), the Tenth Circuit Court of Appeals construed the Supreme Court's *Fabe* opinion as establishing a three-part test for determining whether reverse preemption should apply:

(1)    Does the federal statute at issue "specifically relate to the business of insurance?"

(2)    Was the state statute enacted "for the purpose of regulating the business of insurance?"

(3)    Would the application of the federal statute "invalidate, impair, or supersede" the state statute?

*Davister*, 152 F.3d at 1279 n.1;[25] *see also BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1098 (10th Cir. 1999) (applying three-part *Fabe* test to conflict between federal RICO claims and Missouri insurance statutes).  Therefore, the Court will apply the three *Fabe* factors to the circumstances of this case.[26]

---

[25]  The *Fabe* opinion does not itself formally establish three criteria for reverse preemption under the McCarran-Ferguson Act.  Rather the Tenth Circuit's three-part test in *Davister* is apparently derived from the Supreme Court's analysis of the specific clauses of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b).  *See Fabe*, 508 U.S. at 500-01.  The parties in *Fabe* agreed the Federal Priority Act did not "specifically relate" to the business of insurance and that it would "invalidate, impair, or supercede" the Ohio priority statute.  *Id.* at 501.  The remaining issue was whether the Ohio priority statute was enacted "for the purpose of regulating the business of insurance."  *Id.*  The Court held the Ohio priority scheme did "regulate the business of insurance" to the extent it protected the interests of insurance policyholders, and thus reverse preempted the Federal Priority Act.  *Id.* at 506, 508.  However, the Court held McCarran-Ferguson reverse preemption did not apply with respect to priorities for other types of creditors such as employees of an insolvent insurer because these priorities did not ultimately protect policyholders.  *Id.* at 508.

[26]  The Commissioner argues this Court should disregard the *Davister* guidance and follow the Supreme Court's *dicta* in *Rush Prudential HMO, Inc. v. Moran (Rush Prudential)*, 536 U.S. 355, 373 (2002) which, the Commissioner asserts, suggests it is not necessary for a state law to satisfy all three factors in *Fabe* for reverse preemption to apply.  The comment cited by the Commissioner reads: "[b]ecause the factors are guideposts, a state law is not required to satisfy all three McCarran-Ferguson criteria to survive preemption . . . ."  *Id.* at 373 (*citing UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 373 (1999)).  The Commissioner's argument fails to appreciate the context in which this statement was made.

First, *Rush Prudential* does not concern state insurance insolvency proceedings and does not mention the *Fabe* factors at all.  Rather, the opinion concerns the special context of ERISA preemption of state insurance laws.  In *Rush Prudential*, the Supreme Court considered whether ERISA preempted an Illinois statute requiring HMOs to provide an independent review of disputes between primary care physicians and HMOs, and to cover services deemed medically necessary by an independent reviewer.  *Id.* at 359-64.  Until 2003, the Supreme Court's test to determine whether a state law "regulates insurance" for purposes of ERISA preemption included the factors for determining whether a practice is the "business of insurance" identified by the Supreme Court in *Union Labor Life Ins. Co. v. Pireno (Pireno)*, 458 U.S. 119, 129 (1982).  *See Rush Prudential*, 536 U.S. at 365-66, 373; *see also Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 742-43 (1987).  Read in context, it is apparent the "three McCarran-Ferguson criteria" mentioned in *Rush Prudential* are the three *Pireno* factors, not the three *Fabe* factors.  *See Rush Prudential*, 536 U.S. at 373.

### 1. Does the Bankruptcy Code "Specifically Relate to Insurance?"

As best stated by the Sixth Circuit Court of Appeals:

> The threshold question is whether the federal statute at issue "specifically relates to the business of insurance." If it does, then the McCarran-Ferguson Act by its own terms does not allow for reverse preemption.

*Genord*, 440 F.3d at 805 (citing 15 U.S.C. § 1012(b)).  It is widely recognized the Bankruptcy Code does not "specifically relate to the business of insurance."[27]  *See Barnett Bank of Marion County, N.A. v. Nelson (Nelson)*, 517 U.S. 25, 42 (1996) ("Many federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance . . . .").  This conclusion is supported by § 109(b)(2) which expressly excludes domestic insurance companies from relief under the Bankruptcy Code.  *See In re PRS Ins. Group, Inc. (In re PRS)*, 294 B.R. 609, 612 (D. Del. 2003); *see also Munich Amer. Reins. Co. v. Crawford (Munich)*, 141 F.3d 585, 595 (5th Cir. 1998), *cert. denied*, 525 U.S. 1016 (1998) (reading § 109 together with the McCarran-Ferguson Act, it is evident that "Congress has evinced a strong federal policy in favor of deferring to state regulation of insolvent insurance companies . . . .").  Therefore, the Court concludes the Bankruptcy Code does not "specifically relate to the business of insurance."

---

Moreover, in 2003, the Supreme Court in *Kentucky Ass'n of Health Plans, Inc. v. Miller (Miller)*, 538 U.S. 329, 340 (2003) abandoned the *Pireno* factors and McCarran-Ferguson analysis in the context of ERISA preemption. Writing for a unanimous Court, Justice Scalia criticized the *dicta* in *Rush Prudential* on which the Commissioner now relies, stating:

> Our holdings in *UNUM* and *Rush Prudential* – that a state law may fail the first McCarran-Ferguson factor [and] yet still be saved from pre-emption under § 1144(b)(2)(A) – raise more questions than they answer and provide wide opportunities for divergent outcomes.  May a state law satisfy any two of the three McCarran-Ferguson factors and still fall under the saving clause?  Just one?  What happens if two of three factors are satisfied, but not "securely satisfied" or "clearly satisfied," as they were in *UNUM* and *Rush Prudential*?

*Miller*, 538 U.S. at 340.

The Court finds the rationale in *Miller* to be equally persuasive as applied to the *Fabe* factors and the context of insurance insolvency.  Splitting the *Fabe* factors into independent tests would only add to the existing confusion in applying the *Fabe* standard.  Furthermore, this Court's own review of the case law has identified no bankruptcy or insurance insolvency case in which the *dicta* in *Rush Prudential* has been followed.  Therefore, the Court finds all three of the *Fabe* factors must be met for reverse preemption to apply.

[27] *See also In re PRS Ins. Group, Inc. (In re PRS)*, 294 B.R. 609, 612 (D.Del. 2003); *In re Amwest Ins. Group., Inc. (Amwest)*, 285 B.R. 447, 452 (C.D. Cal. 2002) ("the Bankruptcy Code in general . . . does not relate to the business of insurance."); *In re Reliance Group Hldgs., Inc. (Reliance Group)*, 273 B.R. 374, 404 (Bankr. E.D. Pa. 2002) ("The federal Bankruptcy Code is not (directly) related to the business of insurance"); *In re Advanced Cellular Sys. (Advanced Cellular)*, 235 B.R. 713, 719 (Bankr. D.P.R. 1999) ("there is no question the Bankruptcy Code does not specifically relate to the business of insurance").

## 2.      Does the State Statute "Regulate the Business of Insurance?"

The second *Fabe* factor asks whether a state statute was "enacted for the purpose of regulating the business of insurance." *Davister*, 152 F.3d at 1279 n.1.  To aid this inquiry, the Supreme Court in *Fabe* looked to the three factors set forth in *Pireno*[28] to determine whether the "practice"[29] being regulated by the statute is the "business of insurance."   At the same time, the Court cautioned that the question of whether a statute was "enacted for the purpose of regulating the business of insurance" is a potentially broader inquiry than whether a particular practice constitutes the "business of insurance."[30]  As the Court clarified:

> The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance.  This category necessarily encompasses more than just the 'business of insurance.' . . . [W]e believe that the actual performance of an insurance contract is an essential part of the 'business of insurance.'  Because the Ohio statute is 'aimed at protecting or regulating' the performance of an insurance contract, it follows that it is a law 'enacted for the purpose of regulating the business of insurance' within the meaning of the first clause of § 2(b) [15 U.S.C. § 1012(b)].

*Id.* at 505 (citations omitted).

However, before addressing whether Hawaii's insurance insolvency laws have the purpose of regulating the business of insurance, the Court must first determine whether its analysis must include the ISRLA in its entirety or only specific statutes directly related to this case.  Lower courts have differed on whether *Fabe* requires a statute to be "parsed" by its

---

[28]  The *Pireno* factors include: (1) "whether the practice has the effect of transferring or spreading a policyholder's risk;" (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured;" and (3) "whether the practice is limited to entities with the insurance industry."  *See Pireno*, 458 U.S. at 129.  Although an affirmative answer to these questions may indicate the practice is in the "business of insurance," none of the individual criteria are necessarily determinative in and of themselves.  *Id.*; *see also Genord*, 440 F.3d at 806.

[29]  The term "practice" refers to the "'practices' and 'activities' that satisfy the criteria set forth in *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119 (1982)."  *Owensboro Nat'l Bank v. Stephens*, 44 F.3d 388, 391 (6th Cir. 1994).  The requirements under the "business of insurance" clause of the McCarran-Ferguson Act are tested "not by the mere identity of the defendant as an insurance company but rather by whether the activity constitutes the business of insurance."  *Arroyo-Melecio v. Puerto Rican American Ins. Co.*, 398 F.3d 56, 67 (1st Cir. 2005).

[30]  In *Fabe*, the Supreme Court resisted the notion that reverse preemption under the McCarran-Ferguson Act should look only to whether the practice being regulated is the "business of insurance" as defined in *Pireno* and *Group Life and Health Ins. Co. v. Royal Drug*, 440 U.S. 205 (1979).  Instead, the focus is on whether the state statute was enacted for the purpose of regulating the business of insurance.  *Fabe*, 508 U.S. "To equate laws 'enacted . . . for the purpose of regulating the business of insurance' with the 'business of insurance' itself . . . would be to read words out of the statute."  *Fabe*, 508 U.S. at 504.

individual provisions when determining the extent of the McCarran-Ferguson Act's preemptive effect.[31]  In *Fabe* the Supreme Court stated, "a state statute regulating the liquidation of insolvent insurance companies need not be treated as a package which stands or falls in its entirety" and rejected an "all-or-nothing approach" as "flawed."  *Fabe*, 508 U.S. at 509 n.8.  Similarly, in *Davister*, the Tenth Circuit Court of Appeals stated:

> [W]e do not view *Fabe* to permit *all* actions arising under a state insurance liquidation statute to 'automatically fall under the purview of the McCarran-Ferguson Act.'  As we have noted, a carefully constructed three-part test must be satisfied before the Act can apply.  This examination must be implemented on a case-by-case basis, and the result will be dictated by the *precise* statutes involved in each case (emphasis added).

*Davister*, 152 F.3d at 1280 n.2.  This language strongly suggests the Court must analyze the "precise" statutes involved in this case, and not the entire ISRLA, in order to determine whether each individual statute meets the second *Fabe* factor.

Although the Commissioner argues the ISRLA in its entirety regulates the business of insurance,[32] he refers to five statutes or groups of statutes within ISRLA that specifically regulate the business of insurance to the exclusion of federal bankruptcy law.  These statutes at issue are: (a) the exclusive jurisdiction statute; (b) the statute enjoining actions against the Commissioner; (c) the priority of claims distribution statute; (d) the provisions addressing the administration of claims; and (e) generally, the Hawaii Court's jurisdiction to determine what is property of the liquidation estate.

### a.    *Hawaii's Jurisdiction and Enjoinment Statutes*

Pursuant to the ISRLA, all actions to liquidate an insurance company must be brought in the Circuit Court of the First Circuit of Hawaii.  No other court in Hawaii has jurisdiction to determine insurance liquidation proceedings.  *See* HAW. REV. STAT. § 431:15-104 (g) and (c). (collectively the "Exclusive Jurisdiction Statute").  Additionally, under HAW. REV. STAT.

---

[31]  For example, the First Circuit Court of Appeals in *Garcia v. Island Program Designer, Inc. (Garcia)*, 4 F.3d 57, 61-62 (1ˢᵗ Cir. 1993), held that each provision of a state insurance statute must be considered individually for purposes of the *Fabe* standard.  Similarly, the Sixth Circuit Court of Appeals has determined the application of the *Fabe* standard, and particularly the third prong of "impairment," must be analyzed with respect to the particular federal action and particular facts of the case.  By contrast, the Second Circuit Court of Appeals, in *Stephens v. Amer. Inter. Ins. Co. (Stephens)*, 66 F.3d 41, 45 (2ⁿᵈ Cir. 1995), held a statutory scheme may be considered in its entirety.  The Fifth Circuit Court of Appeals in *Munich* noted the split between the First and Second Circuits and stated "*Fabe's* holding in this respect is simply unclear."  *Munich*, 141 F.3d at 592.  The Court further stated, "*Fabe's* holding and analysis suggest that a statute may require parsing to determine the extent of its pre-emptive power under the McCarran-Ferguson Act.  At the same time, however, the Court stopped short of directing that this approach be taken in every case."  *Id.*

[32]  *See* HAW. REV. STAT. § 431:15-101(d), which states "[t]he purpose of this article is the protection of the interest of insureds, claimants, creditors, and the public generally, with minimum interference with the normal prerogative of the owners and managers of insurers. . . ."

§ 431:15-313(a), all actions against the liquidator are enjoined upon the issuance of an order appointing a liquidator (the "Enjoinment Statute"). Under similar circumstances, the Fifth Circuit Court of Appeals, addressing Oklahoma's Uniform Insurers Liquidation Act, determined both Oklahoma's exclusive jurisdiction and enjoinment statutes were clearly enacted for the purpose of regulating the business of insurance. *See In re Munich*, 141 F.3d at 592-93. Specifically, the Court determined:

> These provisions give the state court the power to decide all issues relating to disposition of an insolvent insurance company's assets, including whether any given property is part of the insolvent estate in the first place. . . . Oklahoma's policy of placing ultimate control over all issues relating to the insolvency proceedings in a single court is aimed at protecting the relationship between the insurance company and its policyholders.

*Id.* at 593.

The Court has reviewed the Oklahoma statutes cited in *Munich* and finds Hawaii's statutes to be substantially similar. Both statutes provide assurances that if an insurance company is to be liquidated, it will be liquidated in a single venue and in an organized fashion. *Id.* at 592. Additionally, the Hawaii Exclusive Jurisdiction and Enjoinment Statutes apply only to insolvent insurance companies and not to insolvent entities in general. *Id.* Therefore, the Court finds both the Exclusive Jurisdiction and Enjoinment Statutes were statutes enacted for the purpose of regulating the business of insurance.

### b.    Hawaii's Priority Distribution Scheme

Hawaii's insurance priority scheme provides in relevant part, "[a]ll claims under policies for losses incurred, including third party claims" shall be paid as Class 2 claims. *See* HAW. REV. STAT. § 431:15-332 (the "Priority Statute"). Under the Priority Statute, claims arising from insurance policies are satisfied prior to those creditors holding general unsecured claims, which are relegated to Class 5. *Id.* A similar issue was the subject of the Supreme Court's opinion in *Fabe*, where the Court determined Ohio's insurance liquidation priority scheme was enacted for the purpose of regulating the business of insurance. *See Fabe*, 508 U.S. at 503-04. The Supreme Court determined "[b]ecause [the priority statute] is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one 'enacted by any State for the purpose of regulating the business of insurance.'" *Id.* at 504.

The Court has compared the Ohio statute analyzed in *Fabe* with Hawaii's Priority Statute and finds no meaningful difference for purposes of its analysis under the second *Fabe* factor.[33]

---

[33] Ohio's insurance liquidation priority scheme, much like Hawaii's statute, provides Class Three creditors (policyholders) will receive payment before Class Four creditors (general unsecured creditors). For purposes of this analysis the statutes are sufficiently similar for this Court to reach the same conclusion made in *Fabe*.

Accordingly, as was the case in *Fabe,* this Court finds Hawaii's Priority Statute is a law enacted for the purpose of regulating the business of insurance.

c.     *Filing of Claims by Creditors*

The Commissioner asserts the ISRLA sets forth separate claim statutes that were enacted for the purpose of regulating the business of insurance.  *See* HAW. REV. STAT. §§ 431:15-325-331 (the "Claims Statutes").  These statutes generally regulate special, third party, disputed, surety, and secured claims and the filing of proofs of these claims.  *Id.*  However, these statutes also provide direction concerning distributions and the orderly administration of the liquidation estate.  For example, HAW. REV. STAT. § 431:15-325 not only provides a mechanism for the filing of a claim, but also permits the liquidator in his discretion to satisfy late-filed claims so long as the payment will not prejudice the orderly administration of the liquidation.  HAW. REV. STAT.
§ 431:15-326 not only provides the necessary elements of a proof of claim, but also states that no judgment against an insured after a successful petition of liquidation need be considered evidence of a valid claim.  HAW. REV. STAT. §§ 431:15-327 and 328 provide for the "allowance" of special and third party claims.  Similarly, HAW. REV. STAT. § 431:15-329 sets forth procedures when a liquidator denies a claim in whole or part.  Finally, HAW. REV. STAT. §§ 431:15-330 and 331 provide guidance with regard to surety claims and the determination of the value of a secured claim, respectively.  Although these statutes do not directly address the priority of claims, they are sufficiently analogous to Hawaii's Priority Statute such that the Court's analysis pertaining to the Priority Statute is determinative with regard to the referenced Claims Statutes.[34]  Therefore, the Court finds the Hawaii Claims Statutes were enacted for the purpose of regulating the business of insurance.

For the above cited reasons the Court finds Hawaii's Exclusive Jurisdiction, Enjoinment, Priority and Claims Statutes were enacted for the purpose of regulating the business of insurance.

d.     *Property of the Liquidation Estate*

Unlike each of the previous Hawaii insolvency laws cited, the Commissioner does not set forth a specific statute addressing property of the liquidation estate.  Instead, he argues that while the bankruptcy court has "core" jurisdiction to determine property of the bankruptcy estate under 28 U.S.C. § 157(b)(2), "the jurisdictional scheme prescribed for bankruptcy courts comes into direct conflict with the McCarran-Ferguson Act where the property in question is in the

---

[34] Furthermore, by regulating the filing, allowance and valuation of certain types of claims, these statutes protect an insolvent insurer's policyholders by setting up procedures upon which a liquidator may distribute payments to policyholders and other creditors alike.  Also, the statutes are an integral part of the relationship between the insurer and the insured as they provide an orderly and efficient way for policyholders and other creditors to assert claims against an insolvent insurance company.  Finally, these statutes are limited to entities within the insurance industry as they only apply to administration of claims in the context of an insolvent insurance company.

Page 29 of  41

possession of a liquidator or receiver appointed as part of an insurance insolvency." *Commissioner's Closing Brief*, p.41. This argument is more appropriately addressed in the context of the third *Fabe* factor, which the Court will now examine.

### 3. Does the Debtor's bankruptcy filing "Invalidate, Impair or Supersede" the PrimeGuard Liquidation Proceeding?

Under the third prong of *Fabe*, a court must determine whether the federal action would "invalidate, impair, or supersede" state law. The Supreme Court defined each of these terms in *Humana Inc. v. Forsyth (Humana)*, 525 U.S. 299, 311 (1999). "Invalidate" ordinarily means "to render ineffective, generally without providing a replacement rule or law." *Id.* at 307. "Supersede" ordinarily means "to displace (and thus render ineffective) while providing a substitute rule." *Id.* In this case, permitting First Assured to proceed with its Chapter 11 bankruptcy pursuant to the Bankruptcy Code will not "invalidate" or "supersede" the Hawaii insurance statutes as they are applied to PrimeGuard because those statutes will be in full force and effect to regulate PrimeGuard's liquidation in Hawaii. Rather, the key question in this case is whether First Assured's bankruptcy case will "impair" aspects of the Commissioner's liquidation of PrimeGuard.

The *Humana* Court, in an attempt to clarify 15 U.S.C. § 1012(b) and the concept of "impairment," stated:

> When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

*Humana*, 525 U.S. at 310.[35] In this case, the Commissioner asserts the application of federal bankruptcy law will impair the Hawaii statutes discussed previously. He similarly argues the Excuse Turnover Motion and Cash Collateral Motion require this Court to determine property rights between First Assured and PrimeGuard which will impair the Liquidation Proceeding. The Court will examine each alleged "impairment" as applied to these arguments.

#### a. Hawaii Insurance Statutes

---

[35] In addition to its reformulation of 15 U.S.C. § 1012(b), the Supreme Court rejected several alternative interpretations of "impair." First, the Court rejected the view that "impair" is interchangeable with "invalidate" and "supersede," or that it simply means "the displacement of some portion of a statute or its preclusion in certain contexts." *Id.* at 308. The Court also rejected the view that the term "impair" signaled Congress's intent to withdraw itself from the field of insurance absent an express Congressional statement to the contrary. *Id.* at 308 ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."). Finally, the Court rejected "the polar opposite of that view, *i.e.*, that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation." *Id.* at 309.

Beginning with the individual Hawaii statutes, the Court finds Hawaii's Exclusive Jurisdiction Statute is not impaired by this Court's determination of general issues which affect First Assured's bankruptcy estate. The language of the Exclusive Jurisdiction Statute appears specifically to apply only to other courts within the state of Hawaii when it says, "*[n]o Court of this State* has jurisdiction to entertain, hear or determine any complaint praying for the. . . liquidation . . . or other relief preliminary to, incidental to, or relating to that type of proceeding . . ." (emphasis added). HAW. REV. STAT. § 431:15-104(c).

This Court's exercise of its jurisdiction over First Assured would not entertain, hear or determine any issues relating to the liquidation of PrimeGuard. To the contrary, its jurisdiction extends to First Assured's bankruptcy estate and matters related thereto. Although two simultaneous liquidation proceedings may *affect* certain aspects of PrimeGuard's Liquidation Proceeding, under *Humana*, the federal law must, at a minimum, "directly conflict" with the state regulation in order to "impair" the state law. *See Humana*, 525 U.S. at 310. In this case, there is no direct conflict between Hawaii's insolvency laws and the Bankruptcy Code as they are applied to each separate entity. Thus, Hawaii's Exclusive Jurisdiction Statute will not be impaired by the Debtor's bankruptcy filing.

The Court reaches a similar result regarding Hawaii's Enjoinment Statute which provides in relevant part, "no action at law or equity shall be brought against the insurer or liquidator. . . ." HAW. REV. STAT. § 431:15-313. First Assured has not brought an action *against* the Commissioner by the filing of its bankruptcy case. Rather, First Assured has sought protection under the Bankruptcy Code. Any indirect effect that may occur because of the Debtor's bankruptcy filing and the separate PrimeGuard liquidation is not enough to directly conflict with and thus impair Hawaii's Enjoinment Statute.

As for impairment of Hawaii's Priority Statute, the Court has previously discussed the similarities between the Hawaii Priority Statute and the Ohio priority statute examined in *Fabe*. Although the Supreme Court in *Fabe* determined the Ohio priority distribution scheme regulated the business of insurance, it did not decide the issue of impairment, because the parties agreed "that application of the federal priority statute would 'invalidate, impair, or supersede' the Ohio priority scheme . . . ." *Fabe*, 508 U.S. at 501. Thus, *Fabe* offers limited guidance to this Court's determination of whether Hawaii's Priority Statute is impaired by the Debtor's bankruptcy.

As indicated previously, Hawaii's Priority Statute and the Bankruptcy Code treat policyholders and unsecured creditor claims differently. Policyholders are paid prior to general unsecured claims under the Priority Statute, whereas under the Bankruptcy Code policyholders would be paid simultaneously with other unsecured creditors. However, because two separate estates exist, the conflict between the Priority Statute and the Bankruptcy Code with regard to the order of payment is of little consequence. If a policyholder maintains a claim against PrimeGuard and files its claim with the Commissioner, he will likely be paid as a Class 2 creditor. If that same policyholder also maintains a claim against the Debtor and files a timely proof of claim, he will be paid with other general unsecured creditors. There is nothing troublesome about each liquidation estate paying creditors separately and pursuant to their

respective distribution schemes.  Admittedly, creditors may need to file a claim in each estate, but this is the reality of a situation where two separate, but related, entities have concurrent liquidation proceedings in state and federal courts.  Accordingly, the Court finds the Debtor's bankruptcy does not impair the Hawaii Priority Statute.

The same reasoning applies to Hawaii's Claims Statutes.  The Debtor's bankruptcy case will not impair the application of the Hawaii statutes to those claims filed in the PrimeGuard liquidation estate.  Those separate claims that may be filed in the Debtor's bankruptcy case will be governed by the Bankruptcy Code.

For the foregoing reasons, the Court finds the Bankruptcy Code and this Court's determination of issues with regard to First Assured's bankruptcy estate will not "invalidate, impair or supercede" those Hawaii insurance statutes referenced above.

       *b.*     *Property of the Liquidation Estate*

The Commissioner's final argument with regard to impairment is not based on a specific statute, but rather is asserted in general terms.  He states, "the jurisdictional scheme prescribed for bankruptcy courts comes into direct conflict with the McCarran-Ferguson Act where the property in question is in the possession of a liquidator or receiver appointed as part of an insurance insolvency."  *Commissioner's Closing Brief*, p.41.

There is ambiguity in the case law as to whether the proper object of the Court's attention in determining "impairment" should be the state insurance statutes exclusively or the state regulatory and administrative processes implemented pursuant to a state's insurance statutes.[36] In *Humana*, the Supreme Court appears to have endorsed the latter view.  While the *Humana* definitions of "invalidate" and "supersede" relate to the clash between federal and state statutory provisions,[37] "impairment" includes broader consideration of the effects of federal law on "state regulation," "state policy," and "state administrative regimes."  *See Humana*, 525 U.S. at 310.

If this Court determines a disputed asset is property of the Debtor's bankruptcy estate, it cannot also be property of PrimeGuard's liquidation estate.  However, although determinations made by this Court concerning the Debtor's estate may have an indirect effect on the

---

[36] In *Davister*, for example, the Tenth Circuit's three-part formulation of the *Fabe* standard requires a court to determine whether "application of the *federal statute* [will] 'impair, interfere, or supersede' the *state statute*," implying that a court's focus should be on the federal and state statutory language exclusively.  *See Davister*, 152 F.3d at1279 n.1 (emphasis added).  However, the actual analysis in *Davister* looked beyond the terms of the Utah insurance statutes at issue to the likely impact of federal law on Utah's "state *process* designed to protect the interests of policyholders."  *Id*. at 1281-82 (emphasis added).

[37] As defined in *Humana,* "invalidate" means "to render ineffective, generally without providing a replacement rule or law."  *Humana*, 525 U.S. at 307.  "Supersede" means "to displace (and thus render ineffective) while providing a substitute rule."  *Id*.  Both definitions envision a conflict between federal and state statutory provisions.

Commissioner's ability to liquidate PrimeGuard, the Court finds the mere possibility of interaction between the proceedings does not rise to the level of "impairing" the Hawaii Court Liquidation Proceeding as required by *Humana*. *See Humana*, 525 U.S. at 310; *see also AmSouth*, 386 F.3d a763, 783 (6th Cir. 2004) ("impairment does not occur unless the integrity of the core liquidation proceedings is attacked").

Courts have disagreed whether the determination of property rights impairs a state liquidation proceeding. The Commissioner directs the Court's attention to the *Advanced Cellular* and *Amwest* cases. In *Advanced Cellular*, a Puerto Rico bankruptcy court heard a dispute between a Chapter 11 debtor corporation and the Insurance Commissioner of Puerto Rico, acting as liquidator of an insolvent insurer, regarding ownership of a certificate of deposit. *See Advanced Cellular*, 235 B.R. at 715-17. The debtor sought turnover of the certificate of deposit pursuant to §§ 542 and 543 of the Bankruptcy Code. The Puerto Rico insurance commissioner contended the McCarran-Ferguson Act reverse preempted the bankruptcy court from making a decision regarding the ownership of the asset in light of the liquidation proceeding in Puerto Rico. As a threshold matter, the bankruptcy court determined the question of whether the debtor had a property right over the certificate of deposit was an issue to be addressed in the Puerto Rico liquidation proceedings. *Id.* at 724. On this basis, the court held its own determination of property rights would "impair" Puerto Rico's insurance statutes granting exclusive jurisdiction over insurance delinquency proceedings to Puerto Rico courts, enjoining actions against the insurer or liquidator "in Puerto Rico or elsewhere," and the orderly liquidation of the insolvent insurer. *Id.* at 724-25.

In *Amwest*, the Bankruptcy Court faced the question of whether it had jurisdiction over a tax allocation agreement consisting of approximately $2.75 million in tax refunds already subject to a pending liquidation proceeding in the state of Nebraska. The Court concluded if it were to exercise its jurisdiction and decide the tax allocation agreement, its decision would likely impair the progress of the liquidation proceeding in Nebraska. *See Amwest*, 285 B.R. at 455.

Other cases, however, suggest a federal court's ordinary determination of property rights, interpretation of contracts, or interpretation of state statutes does not "impair" state law, even when a federal court's decision has a financial impact[38] on the insolvent insurer's estate. *See AmSouth,* 386 F.3d at 784 (federal court's consideration of liquidator's action to recover debt from third-party would not impair state liquidation scheme); *Gross v. Weingarten (Gross),* 217 F.3d 208, 222 (4th Cir. 2000) (diversity jurisdiction over claims for exoneration, contribution,

---

[38] The fact that a federal action may have a financial impact on the assets of the insolvent insurer's estate does not necessarily indicate a state's liquidation proceeding is "impaired." *See, e.g., Reliance Group*, 273 B.R. at 402 ("While the outcome of this matter may affect the amount of assets in the [insurer's] liquidation proceeding [and in the Debtor's bankruptcy cases], it will not directly impact the state's regulation of insurers or the state's ability to establish rules for the orderly rehabilitation or liquidation of insolvent insurers"). *Cf. Sevigny v. Employers Ins. of Wausau*, 411 F.3d 24, 29 (1st Cir. 2005) (in the context of *Burford abstention*, if financial impact on a insurance liquidation proceeding were a sufficient basis for abstention, a state insurance commissioner "could invoke *Burford* in every federal suit between himself as liquidator and any third party who had a still-unsettled tort or contract dispute with the now-insolvent insurer, regardless of its actual disruptive effect upon the liquidation").

and indemnification would not impair state's exclusive jurisdiction over insurance liquidation); *Suter v. Munich Reins. Co.,* 223 F.3d 150, 161 (3rd Cir. 2000) (federal arbitration of contract rights pursuant to international convention on arbitration awards did not impair state liquidation act);  *Grode v. Mut. Fire Marine and Inland Ins. Co.,* 8 F.3d 953, 960 (3rd Cir. 1993) (diversity jurisdiction over ordinary contract action brought by liquidator on behalf of insolvent insurer did not impair state's exclusive jurisdiction over insurance liquidations); *In re Agway,* 2006 WL 3720350 at *6-7 (Bankr. N.D.N.Y. Dec.15, 2006) (bankruptcy court's jurisdiction over liquidator's proof of claim against bankruptcy estate did not impair state insurance liquidation proceeding); *Reliance Group*, 273 B.R. at 402-04 (bankruptcy court's interpretation of insurance commissioner's order, terms of reinsurance policies, and state property law did not "invalidate, impair or supersede" state insurance liquidation scheme).

This Court finds the rationale expressed in the "non-impairment" cases persuasive.  This finding is further supported by the Court's exclusive jurisdiction over the assets of First Assured's bankruptcy estate.  *See* 28 U.S.C. § 1334(e)(1); *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 446 (2004) ("[b]ankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate."); *In re Rare, LLC*, 298 B.R. 762, 764 (Bankr. D. Colo. 2003) ("it lies within the exclusive province of the bankruptcy courts to determine what interests are part of the estate.").  Generally, a dispute over whether an asset is property of a debtor's estate should and must be resolved in favor of this Court's jurisdiction. *See, e.g., Manges v. Atlas (In re Duval Cty. Ranch Co.)*, 167 B.R. 848, 849 (Bankr. S.D. Tex. 1994) ("Whenever there is a dispute regarding whether property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court."); *Reliance Group*, 273 B.R. at 404 ("When the state law regarding the parties' property rights is not unsettled or difficult, the bankruptcy court is usually the most appropriate forum to determine competing claims to property of the bankruptcy estate.").

Herein, the "impairment" alleged by the Commissioner is one of his own making.  As previously noted, the Hawaii Court has made no judicial determination regarding what property, if any, First Assured held as a "fiduciary and in trust" for the benefit of PrimeGuard.  The Commissioner unilaterally made this decision by seizing certain assets and property that may belong to First Assured, claiming they were being held in trust for PrimeGuard.  Having made that decision he cannot hide behind that choice and now claim this Court cannot determine the "ownership" of those assets without impairing the Liquidation Proceeding.  The McCarran-Ferguson Act is not so broad as to allow state insurance liquidators to strip non-insurance entities of their protections under the Bankruptcy Code by simply seizing their assets and wrapping them beneath the cloak of an insurance liquidation proceeding.[39]  *Cf. FTC v. Travelers Health Ass'n,*

---

[39]  Along similar lines, *FTC v. Travelers* cautions that the scope of McCarran-Ferguson reverse preemption, and hence the regulatory power of state insurance liquidators, may be limited when applied beyond a state's borders. The Supreme Court noted that in drafting § 1012(b) of the McCarran-Ferguson Act, "it is clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated.  There was no indication of any thought that a State could regulate activities carried on beyond its own borders."  *FTC v. Travelers*, 362 U.S. at 300.  In this case, the fact the Commissioner seeks reverse preemption

361 U.S. 293, 297-298 (1960) (McCarran-Ferguson Act did not allow a Nebraska statute regulating interstate insurance advertising by domestic insurance companies to "take [] from the residents of every other State the protection of the Federal Trade Commission Act"). Because this Court maintains exclusive jurisdiction to determine property of the bankruptcy estate and to resolve competing claims to estate property, the Court finds it may exercise its jurisdiction as to property issues affecting the Debtor without impairing the Hawaii Court Liquidation Proceeding. *See Reliance Group*, 173 B.R. at 404.

c.    *Burford Abstention*

At this point, it is appropriate to discuss the Commissioner's arguments concerning *Burford abstention*. *Burford abstention* gives federal courts the flexibility to avoid exercising jurisdiction when doing so would interfere with the "independence of state governments in carrying out their domestic policy." *Burford*, 319 U.S. at 318. The third element of the *Fabe* standard, and in particular the *Humana* definition of "impair," substantially overlap with the concerns of *Burford abstention*. *See Gross*, 217 F.3d at 223 ("[T]he [*Burford*] abstention doctrine's goal of preventing 'needless conflict with state policy' maps neatly onto the McCarran-Ferguson Act's purpose of preventing impairment of state insurance regulation.") (*quoting Burford*, 319 U.S. at 327)). As reformulated in *New Orleans Pub. Serv., Inc. v. Council for New Orleans ("NOPSI")*, 491 U.S. 350 (1989), the *Burford abstention* doctrine states:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*NOPSI*, 491 U.S. at 361 (*quoting Colorado River*, 424 U.S. at 814). The Supreme Court has further stated, "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (quotations omitted). Further, the equitable balance between federal and state interests "only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of [a federal court] to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996).

The Commissioner's argument in support of *Burford abstention* is essentially the same as his argument for reverse preemption under the McCarran-Ferguson Act. The Court has already determined that exercising jurisdiction over the property of the Debtor's estate will not impair

---

of a bankruptcy in Colorado is another factor supporting a finding of "no impairment."

the Hawaii Court Liquidation Proceeding.  Indeed, determining the property of a debtor's estate
is "among the most common proceedings dealt with by this Court."  *See In re Agway*, 2006 WL
3720350 at *7 (declining to exercise *Burford abstention* over a proof of claim filed by the
liquidator of an insurance company).  Further, the Commissioner has provided unconvincing
evidence, if any, that the Court's determinations regarding property of the Debtor's estate will
involve difficult issues of state law or disrupt state efforts to establish a coherent policy
regarding a matter of substantial public concern.  *See NOPSI*, 491 U.S. at 361. Therefore, the
Court declines to exercise *Burford abstention* in this case.

**E.**      **Dismissal Under § 1112(b)**

        Because the Court has determined the Debtor is eligible for Chapter 11 relief and the
McCarran-Ferguson Act does not apply to this case, dismissal or abstention based on this
assertion is not appropriate.  However, the Commissioner also seeks dismissal of this case
pursuant to § 1112(b).  Specifically, the Commissioner maintains dismissal is warranted under
§ 1112(b) for bad faith, the Debtor's lack of a reasonable likelihood of rehabilitation or an ability
to confirm a plan of reorganization, and gross mismanagement.  The Debtor, however, argues
none of the requirements for bad faith or other bases for dismissal have been satisfied.

        Although a debtor's bad faith in filing a petition is not an enumerated ground for
dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may
be "cause" for dismissal.  *In re Frieouf*, 938 F.2d 1099, 1105 (10th Cir. 1991) (under § 1112(b),
the Court affirmed dismissal of the bankruptcy case based on the debtor's bad faith and in a
manner prejudicial to creditors).  Several factors have been identified which support a finding of
a bad faith filing in a Chapter 11 case:  (1) the debtor has only one asset; (2) the debtor has only
one creditor; (3) the debtor acquired property which was posted for foreclosure and the prior
owners had been unsuccessful in defending against the foreclosure; (4) the debtor was revitalized
on the eve of foreclosure to acquire the insolvent property; (5) the debtor has no ongoing
business or employees; (6) the debtor lacks a reasonable possibility of reorganization; and (7) the
Chapter 11 filing stopped the foreclosure.  *See In re Nursery Land Dev., Inc. (Nursery Land)*, 91
F.3d 1414, 1416 (10th Cir. 1966); *In re Pacific Rim Invs., LLP*, 243 B.R. 768, 772 (D.Colo.
2000).

        The evidence presented at trial with regard to bad faith was minimal.  Although the
ownership of the Debtor's assets are disputed, this is not a single asset case.  The Debtor in this
case has disclosed numerous assets totaling $13,828,323.38.  *See Commissioner's Exhibit 144C*;
Schedule B.  Further, this is not a single creditor case; the Debtor has over 60,000 creditors.
Additionally, none of the Debtor's property has been posted for foreclosure and the Debtor was
not revitalized on the eve of foreclosure.  The Debtor admits it has no ongoing business or
employees, but alleges this is a result of the Commissioner's action in seizing its assets and
terminating its employees.

        The Commissioner asserts the Debtor has no reasonable probability of proposing and
confirming a plan of reorganization.  However, the Debtor's current President, Robert Dungan,

testified the Debtor anticipates filing a liquidating plan in this case. Liquidation under the control of the debtor has been determined to be sufficient to withstand a request for dismissal or conversion under § 1112(b). *See In re Western Pac. Airlines, Inc.* 218 B.R. 590, 595 (Bankr. D. Colo. 1998). Thus, the fact the Debtor has no reasonable likelihood of rehabilitation is not determinative. Additionally, the Commissioner has failed to demonstrate the Debtor will be unable to confirm its liquidation plan.

The Debtor did not file its case on the eve of foreclosure, although it did file its bankruptcy immediately prior to the hearing on the Commissioner's Consolidation Motion. However, because the Debtor only meets one of the bad faith factors listed above, *i.e.*, no ongoing business and no employees, the Court finds the Debtor's timing in filing the case does not demonstrate bad faith, and further finds all the circumstances of the case do not support a finding of bad faith.

Finally, the Commissioner contends the Debtor has grossly mismanaged its estate. However, the Commissioner provided no evidence to support this claim. Although there was testimony that the Debtor's insiders may have borrowed several hundred thousand dollars from First Assured or were listed on First Assured's payroll while not providing services to the Debtor, these allegations were not developed at trial. Furthermore, these allegations, if true, relate to prepetition conduct and do not relate to the Debtor's postpetition mismanagement of the estate as is required under the clear language of § 1112(b).[40] *See* 11 U.S.C. § 1112(b)(4)(B). Therefore, the Court finds "cause" has not been established under § 1112(b) to dismiss the Debtor's case.

## F.     Relief from the Automatic Stay

As an alternative to dismissal, the Commissioner seeks relief from the automatic stay pursuant to §§ 362(d)(1) and 362(b)(4) in order to continue prosecution of his Consolidation Motion in the Hawaii Court. The principal issue presented by the Consolidation Motion is whether the Hawaii Court should substantively consolidate and jointly administer PrimeGuard and First Assured. *Commissioner's Stay Motion*, p.4.

As grounds for relief from stay under § 362(d)(1), the Commissioner asserts "cause" exists based on bad faith, the McCarran-Ferguson Act, federal abstention doctrine under *Burford abstention*, or abstention under 28 U.S.C. § 1334(c)(1) and (c)(2). The Court has previously considered each of these arguments in relation to the Commissioner's Motion to Dismiss, and concluded the Commissioner failed to demonstrate grounds for dismissal or abstention under any of these theories. For the same reasons, the Court will not grant relief from stay on these grounds.

---

[40]  The term "gross mismanagement *of the estate*," arguably renders any prepetition mismanagement irrelevant. *See In re Rey*, 2006 WL 2457435, *5 (Bankr. N.D. Ill. Aug. 21, 2006) (emphasis added).

The Commissioner alternatively contends he should be excepted from the automatic stay pursuant to § 362(b)(4) because the Liquidation Proceeding is a proceeding by a governmental unit to enforce its regulatory powers.  The Debtor, however, argues the Commissioner, as liquidator, is not enforcing his regulatory powers as a "governmental unit," but rather is protecting a pecuniary interest.

Section 362(b)(4) provides in relevant part:

The filing of a petition under section 301, 302, or 303 of this title . . . does not operate as a stay–under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

Section 362(b)(4) is to be construed narrowly.  *See Board of County Com'rs of County of Archuleta v. Fairfield Communities, Inc.*, 122 B.R. 128, 130 (D.Colo. 1990).

In the context of this case, the Commissioner's enforcement of his police or regulatory powers pertain to his regulation and liquidation of PrimeGuard, a non-debtor entity and not the Debtor.  PrimeGuard did not file a bankruptcy petition in this case and therefore the Commissioner cannot argue his action to "regulate" PrimeGuard through its liquidation is imputed to First Assured.  This is especially true in this case where the Commissioner has failed to prove First Assured is the alter-ego of PrimeGuard.  However, even if the Commissioner's argument could somehow extend to the facts and circumstances of First Assured's bankruptcy case, at least one court has determined when a state insurance commissioner acts in the role of a liquidator rather than on behalf of the state, he is not acting as a "governmental unit" under § 362(b)(4).  *See Reliance Group*, 273 B.R. at 387-89 (a state insurance commissioner was not acting as a "governmental unit" when acting as a liquidator, "but in her role as liquidator for the benefit of creditors, members, policyholders, or shareholders. . . .").  The facts in this case are similar to the facts in *Reliance Group* in that the Commissioner is acting as the liquidator of PrimeGuard rather than as the Insurance Commissioner of the State of Hawaii, and therefore is not acting as a "governmental unit."  Thus, the Court finds § 362(b)(4) simply does not apply to the facts of this case.

For the reasons above, the Court finds relief from stay cannot be granted under § 362(d)(1) and the Commissioner is not exempted from application of the automatic stay under § 362(b)(4).

### G.    The Excuse Turnover Motion and Cash Collateral Motion

#### 1.    Excuse Turnover Motion

Pursuant to § 543(d), the Commissioner requests this Court excuse him from turnover of certain property over which he maintains possession and control, claimed by the Debtor to be bankruptcy estate property.[41]  Section 543 states in relevant part:

> (a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, *property of the debtor*, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property (emphasis added).

> (d) After notice and hearing, the bankruptcy court--

>> (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and

>> (2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

The Commissioner's request to be excused from turnover of property does not specify whether he seeks to proceed under subsection (d)(1) or (d)(2).  In general, however, his request is based on the First Amended Seizure Order and the Liquidation Order entered by the Hawaii Court, which orders allegedly indicate the property to which the Debtor claims an interest in this bankruptcy case constitutes property of the Liquidation Proceeding.[42]

---

[41] The Excuse Turnover Motion primarily relates to approximately $5.5 million held by the Commissioner in various bank accounts.  *See Commissioner's Exhibit 4.*  However, it also references certain furniture and equipment, including computer equipment, documents and electronically stored data, books and records of which the Commissioner has also taken possession.  *Id.*

[42]  In relation to the First Amended Seizure Order and the Liquidation Order, the Commissioner asserts the Debtor is precluded from re-litigating those Orders in this Court based on the *Rooker-Feldman* doctrine, collateral estoppel and *res judicata*.  However, as noted previously the Hawaii Court never made a determination regarding what assets, if any, First Assured and 1Source held "as fiduciaries and in trust" for the benefit of PrimeGuard. Because no previous judicial determination exists on this particular issue, the Court finds none of the

Section 543(a) specifically indicates a custodian may not take any action in the administration of *property of the debtor* except to preserve such property. Pursuant to the language contained in § 543(a), the Commissioner's Excuse Turnover Motion under § 543(d) could be read as a tacit admission the property he is holding is indeed property of the Debtor. However, the Court understands the Commissioner's position to be otherwise. Taken in this light, the Commissioner's Excuse Turnover Motion is in actuality "a proceeding to determine . . . [an] interest in property," which must be brought as an adversary proceeding. *See* FED. R. BANKR. P. 7001(2).[43] Therefore, the Court finds the Commissioner's request under § 543(d) must be denied without prejudice and brought as an adversary proceeding.

### 2.     Cash Collateral Motion

The Commissioner asserts First Assured holds $350,000 of cash in its debtor-in-possession account that is property of the Liquidation Proceeding. The Debtor disputes the Commissioner's interest in these funds. Pursuant to § 363(a),

> "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363.

The Court notes a discrepancy between the Cash Collateral Motion and the Commissioner's Closing Brief. The Cash Collateral Motion and the Debtor's Objection thereto refer to nine checks totaling $109,236.21 that the Commissioner turned over to the Debtor on or about June 28, 2006. The Commissioner's Closing Brief, however, asserts First Assured holds approximately $350,000 which is subject to a constructive trust and constitutes cash collateral. After reviewing the evidence, the Court finds determination of this matter is not possible without additional evidence and clarification from the parties as to what amounts are claimed as cash collateral. Therefore, the Court will set an additional hearing on this issue and if necessary take further evidence in this matter.

### CONCLUSION

---

Commissioner's asserted "estoppel" grounds are applicable to the facts of this case.

[43] FED. R. BANKR. P. 7001 states, "[a]n adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings: (2) a proceeding to determine the validity, priority, or extent of a lien *or other interest in property* . . . ." (emphasis added).

Based on the preceding discussion, the Court finds the Debtor is not a "domestic insurance company" for purposes of § 109(b) and thus may be a debtor under Title 11.  Further, the Commissioner has failed to establish First Assured is the alter-ego of PrimeGuard. Additionally, the Court finds abstention from the Debtor's entire case under 28 U.S.C. § 1334(c)(1) or (c)(2) is not appropriate nor is abstention under § 305 appropriate under the facts of this case.

Furthermore, the McCarran-Ferguson Act does not reverse preempt federal bankruptcy law under the particular facts of this case, as the Debtor's case will not impair the Hawaii Court Liquidation Proceeding.  Thus, dismissal or abstention from this case based on the McCarran-Ferguson Act is not appropriate.

Additionally, the Court finds the Commissioner has not demonstrated "cause" requiring dismissal of the Debtor's bankruptcy case under § 1112(b).  For these reasons, the Court also denies relief from stay pursuant to §§ 362(d)(1) and 362(b)(4).

In relation to the Commissioner's Cash Collateral Motion, the Court requires additional evidence in order to determine this matter.  Therefore, a separate status and scheduling conference will be set with regard to this motion.  Accordingly, it is

ORDERED the Commissioner's Motion to Dismiss Chapter 11 Proceedings is DENIED.

IT IS FURTHER ORDERED the Commissioner's Amended Motion for Relief from Stay is DENIED.

IT IS FURTHER ORDERED the Commissioner's Motion to Excuse Turnover of Property by a Custodian is DENIED.

IT IS FURTHER ORDERED a status and scheduling conference will be set by separate notice in order to determine remaining questions regarding the Commissioner's Cash Collateral Motion, including the amount of time that will be necessary for the Court to take further evidence in this matter.

Dated  March 6, 2007                          BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

Page 41 of  41